IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

CARLOS PETERSON,

                              Plaintiff,

                                        Civil Action No.
                                        9:10-CV-0026(FJS/DEP)

          v.


CORRECTIONAL OFFICER JOHNSON,
Onondaga County Justice Center,

                              Defendant.


APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

CARLOS PETERSON, *Pro Se*
08-B-3052
Clinton Correctional Facility
P.O. Box 2002
Dannemora, NY 12929


FOR DEFENDANT:

HON. GORDON J. CUFFY            KAREN ANN BLESKOSKI, Esq.
Onondaga County Attorney       Assistant County Attorney
John H. Mulroy Civic Center
421 Montgomery Street
10th Floor
Syracuse, NY 13202

DAVID E. PEEBLES
U. S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Carlos Peterson, who is now a New York State prison inmate and is proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendant violated his civil rights while he was housed in the Onondaga County Justice Center ("OCJC"). In his complaint, Peterson asserts that he was harassed by the defendant corrections officer and that the officer failed to protect him from an alleged attack by another inmate. As relief, plaintiff apparently seeks compensatory damages.[1]

Currently pending before the court is defendant's motion for summary judgment seeking dismissal of plaintiff's complaint on the grounds that 1) plaintiff's claims are subject to dismissal for failure to exhaust available administrative remedies, 2) the undisputed facts demonstrate that plaintiff cannot establish a viable Eighth Amendment claim, and 3) in any event, he is entitled to qualified immunity from suit. Having carefully considered the

---

[1]     In the pleading presently before the court plaintiff does not demand an award of a specific amount of money damages, instead merely stating at the end of his complaint that he "would like to sue for damages and injuries against Corr. Johnson on the basis of municipal liability." Second Amended Complaint (Dkt. No. 12) ¶ 5. Plaintiff's first amended complaint, however, did request for an award of $5,000,000 in damages. *See* Dkt. No. 5.

2

record before the court, I recommend that defendant's motion be granted,

and that judgment be entered in his favor.

II.    <u>BACKGROUND</u>[2]

The events giving rise to the claims in this action occurred while

the plaintiff was housed at the OCJC, where he was held from May 4, 2008

until his transfer to a New York State correctional facility on September 23,

2008.  Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 5.[3]  At the time

of those events, which occurred on May 21, 2008, defendant Eric Johnson, a

Housing Deputy with the Onondaga County Sheriff's Department, was

assigned as the sole C-Watch supervising deputy to pod 4B and was

responsible for fifty-eight inmates.  *Id.* at ¶ 6; Johnson Aff. (Dkt. No. 25-3) ¶

2.

At approximately 4:52 p.m. on that date Deputy Johnson heard a loud

crash coming from the left side of his desk.  Johnson Aff. (Dkt. No. 25-3) at ¶

3; Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 8.  Quickly

approaching the area, the defendant observed several prisoners crowded

_____

[2]    In light of the procedural posture of the case the following recitation is
derived from the record now before the court, with all inferences drawn and
ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d
Cir. 2003).

[3]    As will be seen, by virtue of his failure to submit a response to
defendant's Local Rule 7.1(a)(3) Statement plaintiff is deemed to have admitted the
facts set forth within it.  *See* pp. 12 - 19, *post.*

3

around inmate Timothy Green's cell.  Johnson Aff. (Dkt. No. 25-3) at ¶ 4.

Upon Deputy Johnson's arrival, the other inmates dispersed, and he saw

inmates Green and Peterson in Green's cell, where Green had Peterson

pinned down on his bunk.  *Id.*; Defendant's Local Rule 7.1(a)(3) Statement

(Dkt. No. 25-6) ¶ 9.  In accordance with his training, defendant directed all

other inmates in the pod to lock in to their cells and, using his portable radio,

signaled called a code orange, indicating an emergency situation of inmates

fighting and activating the Sheriff's Emergency Response Team ("SERT").

Johnson Aff. (Dkt. No. 25-3) ¶ 5; Defendant's Local Rule 7.1(a)(3) Statement

(Dkt. No. 25-6) ¶ 13.

The other inmates in the pod locked in to their cells, as instructed, and

plaintiff and Green ceased fighting.  Johnson Aff. (Dkt. No. 25-3) ¶ 4.

Following defendant's order that he do so, Green backed off from Peterson

and released him.  *Id.*  Green and Peterson remained nose-to-nose,

however, yelling at each other, and Deputy Johnson observed that the toilet

in the cell had been smashed.  *Id.*; Defendant's Rule 7.1(a)(3) Statement

(Dkt. No. 25-6) ¶¶ 10, 11.  The officer ordered Peterson to lock in to his own

cell; plaintiff failed to comply with that directive, however, and continued

screaming at Green.  Johnson Afd. (Dkt. No. 25-3) ¶ 4; Defendant's Local

Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 13.  Green then punched the

4

plaintiff, causing him to fall to the ground, where Green continued to beat

Peterson.  Johnson Aff. (Dkt. No. 25-3) ¶ 4 and Defendant's Exh. E (Dkt. No.

25-11); Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 12.  By

the time the SERT deputies responded between 4:55 and 5:00 p.m. the

altercation had ended, and plaintiff was returning to his cell while Green

remained in his cell. Johnson Aff. (Dkt. No. 25-3) ¶ 6.

Plaintiff apparently injured his right knee on the broken toilet during the

altercation; he was examined by an OCJC nurse at approximately 5:01 p.m.[4]

and then transported to the emergency room at University Hospital for

treatment.  Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 15; *see*

*also* Plaintiff's Medical Records (Dkt. No. 37).  There the plaintiff was

evaluated, given pain medication and a tetanus shot, and sent for x-rays of

his right knee, and a CT scan of his maxillofacial bones.  Plaintiff's medical

records (Dkt. No. 37) p. 7.  The knee x-ray revealed no joint effusion, and the

CT scan showed some soft tissue swelling over the left mandible but no

fracture or dislocation of the maxillofacial bones.  *See id.*  The laceration to

plaintiff's right knee was repaired with staples, and he was instructed to follow

---

[4]  Defendant's Rule 7.1(a)(3) Statement indicates that plaintiff was examined by a nurse at approximately 5:01 p.m.  Dkt. No. 25-6, ¶ 15.  Defendant Johnson states that plaintiff was examined by the nurse at approximately 5:00 p.m.  Johnson Aff. (Dkt. No. 25-3) ¶ 7.

up with the OCJC physician the next day.  Plaintiff's medical records (Dkt. No. 37) p. 7.

Following the May 21, 2008 incident, both Peterson and inmate Green were issued misbehavior reports for fighting and Green was also charged with disobeying an order; pending their respective disciplinary hearings, both inmates were moved to special housing/administrative segregation and ordered to have no contract with each other.  Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶¶ 15, 19-20, 22.  At their respective disciplinary hearings, though giving varying accounts of how the fight began, both inmates admitted guilt and were issued sanctions.  *Id.* at ¶¶ 20-23.  At no time before commencing this lawsuit did plaintiff report or complain that the defendant had been harassing, annoying, or harming him, or that he had orchestrated the altercation between Green and Peterson, as he now contends.  *Id.* at ¶¶ 25-26.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this civil rights action on January 8, 2010, naming only the OCJC as a defendant and alleging that while incarcerated there "he was assaulted by another inmate due to lack [of] poor supervision from Correctional Officer."  Dkt. No. 1.  By decision and order filed January 13, 2010, Senior District Judge Frederick J. Scullin substituted Onondaga County

6

as the named defendant for the OCJC and directed plaintiff to submit an amended complaint.[5]  Dkt. No. 4.  Plaintiff subsequently submitted an amended complaint, Dkt. No. 5, which was thereafter accepted for filing, Dkt. No. 10.[6]  Following the filing of defendant's answer to the amended complaint, Dkt. No. 13, plaintiff filed a second amended complaint, which was accepted by the court for filing and is now the operative pleading in this action.[7]  Dkt. No. 12.  Though very similar to the amended complaint previously approved by the court, the second amended complaint seemingly alleged for the first time that defendant Johnson "had" inmate Timothy Green attack plaintiff "for him."  *See* Second Amended Complaint (Dkt. No. 12) p. 1. Defendant timely filed an answer to plaintiff's second amended complaint. Dkt. No. 18.

On December 17, 2010, following the close of discovery, defendant

---

[5]     In that initial decision Senior District Judge Scullin also granted plaintiff leave to proceed with this action *in forma pauperis*.  Dkt. No. 4.

[6]     In that decision and order the court also directed that Correctional Officer Johnson be added as a defendant and dismissed Onondaga County as a defendant, without prejudice.

[7]     At the time, the court also observed that the caption of the second amended complaint was confusing to the extent that it identified the defendant as "Onondaga County Justice Center individually Correctional Officer Johnson" and deemed Correctional Officer Johnson as the sole defendant in light of the fact that the Onondaga County and OCJC were previously dismissed as defendants.  See Dkt. No. 17 at n.2.

filed the pending motion for summary judgment.  Dkt. No. 25.  As part of his

response to that motion, plaintiff asked the court to compel production of a

surveillance videotape which plaintiff claimed contained a recording of the

incident alleged in his complaint.  *See* Dkt. No. 26.  The court directed

defendant to respond to the motion to compel.  *See* Text Order dated

December 28, 2010.  In response to the December 28, 2010 Text Order,

defense counsel stated as follows:

> [B]y letter, dated May 25, 2010, I advised Plaintiff that no such
> videotape exists . . . .[8]  Despite this information, Plaintiff continues
> to insist that a videotape exists and continues to refer to the
> videotape of the incident.  As a result of this Court's Text Order I,
> again, requested that the Sheriff's Office review their files for any
> such videotape.  After a thorough search, the Sheriff's Office
> assures me that no such videotape exists, and that a videotape
> has never existed in this matter.

Dkt. No. 27.

By decision and order filed January 14, 2011 ("January Order"), the

court denied plaintiff's motion to compel, stating:

> "Under ordinary circumstances, a party's good faith averment that
> the items sought simply do not exist, or are not in his possession,
> custody or control, should resolve the issue of failure of
> production ...."  *Jackson v. Edwards*, No. 99 CIV. 0892, 2000 WL
> 782947, at *3 (S.D.N.Y. June 16, 2000) (quoting *Zervos v. S.S.
> Sam Houston,* 79 F.R.D. 593, 595 (S.D.N.Y. 1978)); *see also
> Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n. 7

---

[8]      Defense counsel provided the court with a copy of the May 25, 2010
letter to plaintiff.  *See* Dkt. No. 27 at 2-3.

> (S.D.N.Y. 1992) ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion.").  Since plaintiff has offered nothing to show that defense counsel's statement is untrue, or that such a videotape does exist, his motion to compel production of the videotape is denied.

January Order (Dkt. No. 28).  Plaintiff subsequently filed a motion for reconsideration of the January order, which defendant opposed.  Dkt. Nos. 29 and 30.  Noting that "[o]ther than his insistence that the videotape must exist because a camera was running during the alleged event, plaintiff offer[ed] nothing to overcome defendant's [sworn] statement that a videotape does not, and never did, exist", the court denied plaintiff's motion for reconsideration.  Dkt. No. 32.

In support of his current motion for summary judgment, defendant argues that he is entitled to judgment as a matter of law because 1) procedurally, plaintiff failed to exhaust his administrative remedies, 2) on the merits, plaintiff has failed to state a claim under the Eighth Amendment, and 3) in any event, he is protected from liability on plaintiff's claims against him by the doctrine of qualified immunity.  In response to defendant's motion plaintiff has submitted only an unsworn letter succinctly outlining the basis for his opposition to the motion.  Dkt. No. 26.

Defendant's motion is now ripe for determination and has been referred

9

to me for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).

*See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Summary Judgement Standard

    Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106

S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion

Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for

purposes of this inquiry, if it "might affect the outcome of the suit under the

governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also

Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*).  A material fact is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

10

A moving party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the

non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Legal Significance of Plaintiff's Failure to Respond to Defendant's Local Rule 7.1(a)(3) Statement

While in a brief written communication to the court plaintiff has opposed defendant's motion, he has failed to comply with Local Rule 7.1(a)(3), which required him to respond to defendant's statement of undisputed material facts.  Before turning to the merits of plaintiff's claims the court must address as a threshold matter the legal significance of his failure to oppose defendant's Local Rule 7.1(a)(3) Statement.

The consequences of this failure are potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611,

12

2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases)[9]; *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[10]

Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the local rules. *See Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.). Thus, "a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 9:09-CV-308, 2011 WL 11003045, at *1

---

[9]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[10]     As to any facts not contained in the defendant's Local Rule 7.1(a)(3) statements, I will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

(N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.) (citing *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) and *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).  Where a plaintiff has been specifically notified of the consequences of failing to respond to a movant's Rule 7.1(a)(3) Statement but has failed to do so, and the facts contained within that statement are supported by the evidence in the record, the court will accept such facts as true.  *Id.* (citing *Littman v. Senkowski*, 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996)).

In defendant's notice of motion plaintiff was specifically warned of the consequences of his failure to properly respond to defendant's Local Rule 7.1(a)(3) Statement.[11]  The notice of motion served upon plaintiff states, in relevant part,

> PLEASE TAKE FURTHER NOTICE that pursuant to Rule 7.1 of the Local Rules of Practice of the United States District Court for the Northern District of New York, you are required to file a response to Defendant's Statement of Material Facts.  Any

---

[11]     Northern District of New York Local Rule 56.2 mandates that when summary judgment is sought against a *pro se* litigant the moving party must notify that *pro se* litigant of the consequences of failing to respond to the motion.  *See* N.D.N.Y.L.R. 56.2.  While the local rule also advises that a sample notice can be obtained through the court, defendant did not utilize that prescribed sample notice.  Nonetheless, defendant's notice of motion adequately apprised the plaintiff of the consequences of his failure to respond and satisfies the requirements of Local Rule 56.2.

> facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Defendant's Notice of Motion (Dkt .No. 25) p. 3 (unnumbered).

In view of the foregoing, I recommend that, despite plaintiff's *pro se* status, the court accept defendant's assertion of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted when reviewing the pending motion for facial sufficiency.

### C.   Failure to Exhaust Remedies

The record now before the court firmly establishes that while he apparently is familiar with the available grievance process, having filed an unrelated grievance two weeks later on June 5, 2008, plaintiff never filed a grievance complaining of the misconduct that he alleges in his complaint occurred on May 21, 2008.  *See e.g.* Ferguson Aff. (Dkt. No. 25-2) ¶ 10.  In support of his motion for summary judgment defendant asserts that plaintiff's claims are therefore procedurally barred based upon his failure to exhaust available administrative remedies.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"),

Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions.  An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record."  *Jones v. Bock,* 549 U.S. 199, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S. Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

16

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias*, 495 F.3d at 41; *see Hemphill*

17

*v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.[12]

New York requires that every local correctional facility establish,

---

[12]    Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford* has been a matter of some speculation.  *See, e.g., Newman v. Dunkin*, No. 04-CV-395, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).  As one court in this district recently observed, "[w]hile recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs." *Hooks v. Howard*, No. 907-CV-0724, 2010 WL 1235236, at *4 (N.D.N.Y. Mar. 30, 2010) (McAvoy, S.J.) (citing *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir.2006)).

implement, and maintain a formal inmate grievance program.  9 N.Y.C.R.R. § 7032.1.  Defendant has shown that in accordance with this requirement the Onondaga County Sheriff's Office maintains a written directive, procedure and program for inmate grievances at the OCJC.  Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 1; *see also* Ferguson Aff. (Dkt. No. 25-2) ¶¶ 4-5 and Defendant's Exhs. A, B, and D (Dkt. Nos. 25-7, 25-8 and 25-9).  Upon his or her admission at the OCJC each inmate is provided a copy of the inmate handbook, which is written in both English and Spanish and explains the manner in which the OCJC is operated as well as the rules and regulations governing inmates, including the procedure for filing a grievance and for pursuing complaints regarding staff harassment. Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 25-6) ¶ 2.  The applicable Onondaga County Sheriff's Office directive classifies inmate grievances into two categories – informal and formal.[13]  Defendant's Exh. A (Dkt. No. 25-7) p. 1.  An informal grievance is an inmate complaint that is resolved by staff or a unit supervisor; a formal grievance, by contrast, is any complaint that

---

[13]     In addition to filing grievances and harassment complaints through the Onondaga County Sheriff's Office grievance program, OCJC inmates have ready access to telephones and may make free telephone calls to the Human Rights Commission.  Ferguson Aff. (Dkt. No. 25-2) ¶ 7.  A representative of the sheriff's office meets monthly with the Human Rights Commission, and that commission may contact the sheriff's office at any time it receives an inmate complaint.  *Id.* at ¶ 8.

cannot be so resolved to the inmate's satisfaction.  *Id.* at pp. 1-2.

Formal grievances are subject to a five-step procedure.[14]  Defendant's Exh. A (Dkt. No. 25-7) p. 2.  At the first step, an inmate who has attempted without success to resolve the matter informally must specifically indicate an intention to proceed with the formal grievance procedure by signing an inmate grievance form.  *Id.*  At step two, the written notification is forwarded to the Watch Commander and the Section Commander, if necessary, and then forwarded to the designated grievance coordinator within seventy-two hours of the initial complaint.  *Id.*  The third step involves assignment of the complaint to a grievance officer and requires that the inmate be notified of that officer's decision within five business days of receipt of the grievance by the grievance coordinator.  *Id.*  At step four, the inmate then has the right to appeal the grievance officer's decision to the Chief Custody Deputy, within two business day's of the inmate's receipt of decision, and the appeal must be decided within two business days of its receipt.  *Id.*  The final step is an appeal to the New York State Commission of Corrections within three

---

[14]     The inmate handbook outlines a separate procedure to be followed with regard to complaints of staff harassment which requires the initial complaint to be made directly to the staff member doing the harassing; in the event of continuing harassment by that staff member the inmate is directed to notify that staff member's supervisor, who is assigned to make an inquiry into the allegation.  Defendant's Exh. C (Dkt. No. 25-9) p. 27.

working days of a decision at step four.  *Id.*  A review of the evidence before the court confirms that this procedure is clearly explained in the OCJC Inmate Handbook.  *See* Defendant's Exh. C (Dkt. No. 25-9) p. 15. Defendant has thus shown that plaintiff had available to him an administrative remedy to pursue his claims that defendant Johnson harassed and failed to protect him, satisfying the first prong of the *Hemphill* test.[15]

Accordingly, the court's inquiry turns to the second and third prongs of the test.  The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).  The third, catchall factor to be

---

[15]    For his original complaint, plaintiff utilized a form civil rights complaint supplied by the court.  *See* Complaint (Dkt. No. 1) ¶ 4.  In that pleading plaintiff admitted that the OCJC has a prisoner grievance program that was available to him, and though responding in the affirmative to the question asking whether he had filed a grievance regarding the facts alleged in the complaint, in response to a subsequent inquiry as to why he did not choose to present the facts relating to his complaint to the prison's grievance program he responded "I try it before and I never got a respond." *Id.* at ¶ 4.  While this is less than clear, it appears from plaintiff's answers that he had not filed a grievance relating to the misconduct alleged in this lawsuit.  As will be seen, plaintiff has since confirmed that he did not do so, and offers no cognizable justification for his failure to do so.  *See* pp. 22-23, *post*.

considered under the Second Circuit's prescribed exhaustion rubric focuses

upon whether special circumstances have been plausibly alleged which, if

demonstrated, would justify excusing a plaintiff's failure to exhaust

administrative remedies.  *Hemphill,* 380 F.3d at 689; *see also Giano v.*

*Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at

*10.[16]  Defendant has preserved the defense by raising it in his answer to

the second amended complaint, *see* Verified Answer (Dkt. No. 18) ¶ 13, and

plaintiff has alleged no facts suggesting that defendant should now be

estopped from relying on this defense, or that special circumstances exist to

warrant excusing his failure to exhaust administrative remedies.  To the

contrary, in his discovery responses plaintiff candidly admits that he did not

pursue any complaint against defendant for abuse or harassment because it

was only a "mentaly abuse situation[, and] it was simply something that he

would deal with . . .."  Defendant's Exh. K (Dkt. No. 25-18) ¶ 3.  As an

apparent explanation for his failure to file any grievance or complaint

whatsoever regarding the claims alleged in this lawsuit, plaintiff further

---

[16]     Included among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable.  *Giano v. Goord*, 380 F.3d 670, 676-77 (2d Cir. 2004); *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).  In this instance, plaintiff makes no such claim.

states that he "didn't file a grievance [but] instead waited to problem get worser and file a law suite [sic]" and that he "felt that it would just be a waste fo time" to file a grievance because it would be hard to prove defendant's mistreatment of him.  *Id.* at ¶¶ 6, 7.  Additionally, in opposing defendant's motion plaintiff offers no justification for his failure to exhaust administrative remedies, but simply reiterates that he felt that it would be futile.

In light of the foregoing, I conclude that the record before the court unequivocally establishes not only that plaintiff failed to exhaust his administrative remedies, but that there is no basis to excuse his failure.  I therefore recommend that defendant's motion for summary judgment dismissing plaintiff's complaint on this procedural basis be granted.

D.    The Merits of Plaintiff's Claims

The only claims alleged in the complaint in this action are that Deputy Johnson mentally harassed plaintiff daily and that he stood by and watched while inmate Green attacked Peterson.  Though plaintiff's submissions make no reference to defendant's violation of a specific constitutional or statutory provision, liberally construed it appears that plaintiff's claim may be asserted under the Eighth and/or Fourteenth Amendments.[17]  In support of his

---

[17]    Although defendant's memorandum of law suggests that at the relevant time plaintiff was a pre-trial detainee, the record does not clearly disclose whether at the relevant times he had in fact been sentenced and was awaiting transfer to a state

motion, defendant convincingly argues that such claims are subject to dismissal because plaintiff cannot establish a violation of his rights under these constitutional provisions.

1.   Verbal Harassment

To the extent that plaintiff premises any alleged constitutional violations upon verbal harassment by the defendant, his claims fail.  Verbal conduct by prison officials toward an inmate, however offensive it may be, does not constitute cruel and unusual punishment in the constitutional sense.  *Smith v. Goord*, No. 9:08 Civ. 1364, 2010 WL 3488148, at *6 (N.D.N.Y. Aug. 9, 2010) (Treece, M.J.), *report and recommendation adopted*, 2010 WL 3488139 (N.D.N.Y. Aug. 30, 2010) (Mordue, C.J.); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.).  Simply put, section1983 is not intended to represent a code of professional conduct for federal, state and local prison officials.  *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996)

---

facility, or rather remained on pretrial status.  Although one could infer that because the incident occurred shortly after his booking and well prior to his transfer in September 23, 2008 he was a pretrial detainee, and thus subject to the protections of the Fourteenth Amendment rather than the cruel and unusual punishment provision of the Eighth Amendment.  *See* Defendant's Memorandum (Dkt. No. 25-21) p. 5.  As will be seen, it is unnecessary to resolve this potential issue, however, since the analysis to be applied to terms of confinement in both circumstances are essentially congruent. *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009); *see* pp. 27-29, *post*.

(citations omitted); *Williams v. United States*, No. 07 Civ. 3018, 2010 WL 963474, at * 16 (S.D.N.Y. Feb. 25, 2010), *report and recommendation adopted*, 2010 WL 963465 (Mar. 16, 2010); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998). Federal courts are neither equipped nor in the business of overseeing prison operations and performing human resource functions within such settings; rather, the function of the courts in a case such as this is to safeguard the right of prison inmates to be free of confinement conditions running afoul of the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 291 (1976). Mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio*, 1997 WL 642543, at *6 ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation"). Nor do threats amount to a constitutional violation. *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).

In view of these well-established principles, it is clear that plaintiff cannot base a constitutional claim on mere verbal harassment, and I therefore recommend granting defendant's motion as it relates to those claims alleged in plaintiff's complaint.

### 2.  Failure to Protect

Turning to plaintiff's claim that defendant failed to protect him from inmate Green's attack, it is indisputable that prison officials are required to take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from for seen harm caused by fellow inmates. *Farmer v. Brennan*, 511 U.S. 825, 833-34, 114 S. Ct. 1970, 1976-77 (1994) (citations omitted); *see also Matthews v. Armitage*, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (Homer, M.J.) (citing, *inter alia*, *Farmer*). When examining a failure to protect claim a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Matthews*, 36 F. Supp. 2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.). As can be seen, this analysis entails both an objective and subjective inquiry.

26

### a.    Objective Test

In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities." *Dawes v. Walker*, 239 F.3d 489, 493-94 (2nd Cir. 2001) (internal quotations and citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002). Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Dawes*, 239 F.3d at 493; *Matthews*, 36 F. Supp. 2d at 124-25.

### b.    Subjective Test

To demonstrate that a defendant was deliberately indifferent to his or her plight, a plaintiff must show that the prison official actually knew of, but disregarded, an excessive risk to his or her health and safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Matthews*, 36 F. Supp. 2d at 124-25.

As a presumed pretrial detainee, plaintiff's conditions of confinement

were subject to safeguards emanating from the Due Process Clause of the

Fourteenth Amendment, rather than the Eighth Amendment, which governs

such claims brought by inmates serving prison sentences.  *Benjamin v.*

*Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003).  In *Benjamin*, the Second Circuit

acknowledged the government's duty to assume responsibility for the safety,

general well-being, and basic human needs of those whose liberty it

involuntarily restrains, and specifically distinguished between the

circumstances presented by a pretrial detainee, who is still presumed

innocent, and an inmate who has been convicted of a crime.  *Id.* at 50-51.

Following *Benjamin*, however, there was significant uncertainty surrounding

the precise standard to be applied to claims of deliberate indifference

brought by pretrial detainees.  While it was clear that such claims were

subject to analysis under the Due Process Clause of the Fourteenth

Amendment, *Bryant v. Maffucci*, 923 979, 983 (2d Cir. 1991), the precise

contours of the obligation imposed thereunder had not been definitively

established by the Second Circuit until its recent decision in *Caiozzo v.*

*Koreman*, 581 F.3d 63.

     In *Caiozzo*, the Second Circuit found that "it is a logical extension of

the principles recognized in *Farmer* that an injured state pretrial detainee, to

establish a violation of his Fourteenth Amendment due process rights, must

28

prove, *inter alia*, that the government-employed defendant disregarded a risk
of harm to the plaintiff of which the defendant was aware.*" Id*. at 71.  (citing
*Farmer*, 511 U.S. at 837, 114 S. Ct. 1970).  Accordingly, the court held that
"[c]laims for deliberate indifference to a serious medical condition or other
serious threat to the health or safety of a person in custody should be
analyzed under the same standard irrespective of whether they are brought
under the Eighth or Fourteenth Amendment." *Id.* at 72.  In the wake of
*Caiozzo*, it thus appears that the standard for analyzing a failure to protect
claim under the Fourteenth Amendment is identical to that under the Eighth
Amendment.  *See Corye v. Carr*, No. 9:08-CV-46, 2010 WL 396363, at * 8
n.9 (N.D.N.Y. Jan. 26, 2010) (Kahn, J. & DiBianco, M.J.) (citing *Caiozzo* and
finding that the Eighth Amendment standard applied to a pretrial detainee's
failure to protect claim brought under the Fourteenth Amendment).

Applying the Eighth Amendment standard to the undisputed facts
before the court leads to the inescapable conclusion that he cannot
establish a failure to protect claim.  Initially, with regard to the objective
prong of the test, plaintiff does not allege facts suggesting that there was
any prior history between him and inmate Green, or that there was any other
reason for defendant to know that Green posed a threat to plaintiff's safety.
Instead, plaintiff alleges not just that defendant stood by and did nothing to

stop Green's attack on him, but goes so far as to accuse Deputy Johnson of orchestrating the attack.  In his opposition, plaintiff explains that this allegation against defendant is based upon the relationship that inmate Green had as a porter with the defendant and the "great deal of communication together which gives rise to a factual believe [sic] to a friendship relationship."  Plaintiff's Opposition (Dkt. No. 26) p. 1 (unnumbered).  Plaintiff also evidently attributes a retaliatory motive to defendant based upon the criminal charges for which he was being held, which he suggests involved the City of Syracuse police and his brutal beating for which he apparently lodged a complaint with a human rights commission.  *See id.* at p. 2.

There is no dispute that the altercation between the plaintiff and Green took place in Green's cell, and Peterson has provided no explanation as to why he was in that cell, seemingly undermining his allegation that the attack was prearranged and that Green was the aggressor.  Following the incident, Green and Peterson gave divergent accounts of how it began.  While Peterson admitted to being involved in the altercation, he claimed that he thought Green was kidding when he struck him.  Joslyn Aff. (Dkt. No. 25-4) ¶ 5; *see also* Paninski Aff. (Dkt. No. 25-2) ¶ 7.  Green, on the other hand, indicated that plaintiff had been agitating him and willingly accepted his

challenge to enter his cell.  Joslyn Aff. (Dkt. No. 25-4) ¶ 5.

In any event, the evidence in the record establishes that the defendant did not know Green or Peterson before they were placed on pod 4B and that he had no relationship with Green other than that of deputy to an inmate. Contrary to plaintiff's unsupported allegations, upon hearing and then observing the fight, the record discloses that defendant immediately responded as he was trained, calling for assistance and directing both inmates to cease.  While neither Green nor the plaintiff immediately followed defendant's initial order, Green ended his assault of inmate Peterson within no more than a few minutes, and Peterson was escorted from Green's cell with what appear to be relatively minor injuries.[18]  Though plaintiff alleges that the defendant watched inmate Green attack him for about twenty minutes, the record shows that defendant first heard the loud crash at 4:52 p.m., immediately responding to the area, and that the entire incident was

---

[18]    In opposition to the motion plaintiff has submitted medical records which, though incomplete, include at least a portion of the emergency room record of the plaintiff's treatment.  *See* Dkt. No. 37.  Those records establish that plaintiff sustained nothing more than minor cuts to his right hand, a six centimeter laceration to his right knee that was closed with six staples, and an undescribed injury to his face.  Plaintiff also attached select medical records to his first amended complaint, including his progress notes for the day in question and a return from hospital report maintained by the Onondaga County Correctional Health and Mental Health Services, which indicate that plaintiff sustained a contusion to his jaw, which was described as a "golf-ball sized lump" on the left side.  *See* Dkt. No. 5.  It is clear from the emergency room records, however, that any fracture to his maxillofacial bones or dislocation of his mandible was ruled out by X-rays and a CT scan.

31

resolved and plaintiff was visited by a facility nurse approximately nine minutes later, at 5:01 p.m.  Johnson Aff. (Dkt. No. 25-3) ¶¶ 3, 7.

Prior to commencing this lawsuit, plaintiff never reported or claimed to anyone that the defendant failed to intervene or that the altercation between him and Green was instigated or initiated by Deputy Johnson, nor had anyone else made that allegation.[19]  Joslyn Aff. (Dkt. No. 25-4) ¶ 11.  In support of his motion defendant has submitted an sworn statement unequivocally denying that he ever asked, ordered or permitted Green, or any other inmate, to engage in any harassing or physically harmful activity toward the plaintiff.  In the face of defendant's sworn statement, plaintiff's speculative and conclusory allegations to the contrary are insufficient to create a material issue of fact warranting the denial of defendant's motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1988).

In sum, the record is devoid of any evidence showing, objectively or subjectively, that defendant Johnson subjected the plaintiff to a substantial risk of serious harm and exhibited deliberate indifference to plaintiff's safety.

---

[19]     Plaintiff's misbehavior report stemming from the incident was the subject of a disciplinary hearing at which plaintiff admitted being involved in the fight and made no claim that defendant failed to protect him or instigated the altercation.  *See* Defendant's Exh. I (Dkt. No. 25-16).  Additionally, it should be noted that in the notice of claim that plaintiff filed with the County prior to filing suit he similarly makes no mention of any misconduct by defendant.  *See* Defendant's Exh. L (Dkt. No. 25-19).

Accordingly, I recommend a finding that, based upon the record before the court, no reasonable factfinder could find in plaintiff's favor on his failure to protect claim.

III.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint arises out of an altercation occurring between him and another inmate during his confinement at the OCJC.  While plaintiff alleges that defendant Johnson continually harassed him and arranged for inmate Green to attack him, plaintiff never complained of, reported, or filed a grievance alleging such misconduct prior to commencement of this lawsuit. For this reason alone, plaintiff's complaint is subject to dismissal based upon his undisputed failure to exhaust administrative remedies.  Turning to the merits, plaintiff's claims of verbal harassment are patently insufficient to establish a constitutional violation, and the record is barren of any evidence that could potentially lead a reasonable juror to conclude that defendant failed to protect plaintiff from an excessive risk of harm.[20]  For these reasons, it is respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 25) be GRANTED, and that judgment be entered in favor of defendant

---

[20]    In light of my determination, I have found it unnecessary to address the issue of qualified immunity.

33

DISMISSING plaintiff's complaint in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:        August 3, 2011
              Syracuse, New York

34



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*,
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

**\*3** Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd*, 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

### CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. Id. Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable  Rosemary  S.  Pooler,  for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, **pro se**.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

### INTRODUCTION

**\*1** In this **pro se** action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
**summary judgment** pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding **summary judgment** dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims
of medical indifference against defendant Fitzgerald; and
(3) plaintiff's allegations of verbal harassment by
defendant Mason. Magistrate Judge Treece also
recommended denying defendants' motion for **summary
judgment** on plaintiff's excessive force claims against
defendants Tompkins, LaClair, Mason, Malark and Reyell
and plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local **Rule 7**. **1**( **a**) ( **3**); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. See *Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d
Cir.1999); see also *Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7. 1( a)( 3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for **summary judgment.** *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for **summary judgment.** *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> **FN1.** Local **Rule 7**. **1**( **a**)( **3**) provides:
>
> **Summary Judgment** Motions
>
> Any motion for **summary judgment** shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for **summary judgment**. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local **Rule 7**. **1**( **a**)( **3**) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for **summary judgment**. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a **summary judgment** motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local **Rule 7. 1( a)( 3)**, his opposition to defendants' motion contains sworn testimony. In light of his ***pro se*** status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) and *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> **FN2.** While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award **summary judgment** dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for **summary judgment**' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for **summary judgment**")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the **summary judgment** stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on **summary judgment**. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## III. Reyell's Personal Involvement

Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for **summary judgment**) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures.

Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

> Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of **summary judgment**. Accordingly, the Court adopts the Magistrate's recommendation and denies **summary judgment** on this issue.

## CONCLUSION

It is therefore
**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for **summary judgment** is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Slip Copy, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's
§ 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests*, W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. See April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. See March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. See generally Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. See County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

(4)

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey*, 2006 WL 2109465, at *3-5. *See also Hemphill*, 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins*, No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord*, No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot*, No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen*, 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill*, 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane*, 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord*, No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero*, 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane*, 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez*, 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

## I. INTRODUCTION

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the

Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

### REPORT-RECOMMENDATION AND ORDER[FN1]

> [FN1.] This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [FN2] *See*
Compl. (Docket No. 1). Presently pending is defendants'

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

## I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

## II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

*2 A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

### B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

> FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 925054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

*3 when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

> FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified

his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at \*2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at \*2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion

should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
William E. HOOKS, Plaintiff,
v.
T. HOWARD, Correctional Officer, Upstate Correctional Facility; Mr. Mcgaw, Correctional Officer, Upstate Correctional Facility; Galiger, Correctional Officer, Upstate Correctional Facility; Mr. Green, Correctional Officer, Upstate Correctional Facility; Mr. Willette, Defendants.
No. 907-CV-0724 (TJM/RFT).

March 30, 2010.
William E. Hooks, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Christopher W. Hall, Esq., of Counsel, Albany, NY, for Defendants.

### MEMORANDUM-DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** *Pro se* Plaintiff William E. Hooks brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his constitutional rights during his confinement at Upstate Correctional Facility ("Upstate"). Dkt. No. 1. Defendants have filed a motion for summary judgment under Federal Rule of Civil Procedure 56 dismissing the complaint in its entirety. Dkt. No. 49. Plaintiff has submitted papers in opposition. Dkt. No. 51. For the reasons set forth herein, defendants' motion for summary judgment is granted in part and denied in part. With the exception of plaintiff's claims against defendants McGaw, Willette, Galiger and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006, all of plaintiff's claims are dismissed. In light of the foregoing, defendant C.O. Howard is dismissed as a

defendant in this action.

### I. BACKGROUND

At all relevant times concerning this action, plaintiff was an inmate at Upstate in the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff filed his complaint on July 12, 2007. Dkt. No. 1. Plaintiff alleges that defendants, Correction Officers Howard, McGaw, Galiger, Green and Willette, engaged in misconduct in violation of his constitutional rights on eleven separate occasions during the period 2005-2007, each of which is addressed in defendants' summary judgment motion.

Defendants argue that plaintiff's claims with respect to eight of the eleven incidents complained of are subject to dismissal because plaintiff failed to exhaust his administrative remedies as required under law. Dkt. No. 49. In support of their motion, defendants rely upon the supporting affidavits of Christine Gregory, Inmate Grievance Program ("IGP") Supervisor at Upstate ("Gregory Aff." and "Gregory Supp. Aff."), and Karen R. Bellamy, Director of DOCS IGP ("Bellamy Aff."). Bellamy is the custodian of records maintained by the Central Office Review Committee ("CORC"). Bellamy Aff. ¶ 2. As to the three exhausted claims, defendants argue that those claims must be dismissed because the facts alleged by plaintiff are not sufficient to state claims for the violation of his constitutional rights upon which relief may be granted by this Court. Defendants have submitted a statement of material facts as required by Local Rule 7.1 ("Defs.Stmt."), and a supporting memorandum of law ("Defs.MOL").

Plaintiff has responded in opposition to defendants' motion. Dkt. No. 51. In that response, plaintiff admits that five of his claims are unexhausted, but argues that he properly exhausted his administrative remedies with respect to three of the claims on which defendants seek summary judgment. Plaintiff has not responded to defendants' arguments in support of the requested dismissal of plaintiff's three exhausted claims. Plaintiff has submitted a statement of material facts as required by Local Rule 7.1 ("Pl.Stmt ."), and a supporting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

memorandum of law ("Pl.MOL").

## II. DISCUSSION

### A. Summary Judgment Standard

**\*2** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, the entry of summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that there is no genuine issue of material fact to be decided with respect to any essential element of the claim in issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In meeting this burden, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)).

In the event this initial burden is met, the nonmoving party must produce evidence demonstrating that genuine issues of material fact exist. *Celotex,* 477 U.S. at 324; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the opposing party must proffer admissible evidence that "set[s] out specific facts" showing a genuinely disputed factual issue that is material under the applicable legal principles. Fed.R.Civ.P. 56(e); *see, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all justifiable factual inferences in favor of the nonmoving party. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008); *Jeffreys,* 426 F.3d at 553. The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

**\*3** The Prisoner Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). The Supreme Court explained in *Woodford* that the PLRA requires "proper exhaustion," which " 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Woodford* 548 U.S. at 90 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)). While placing prison officials

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense," an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the established grievance system in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

The New York State Department of Correctional Services (DOCS) has created a three-step grievance process known as the Inmate Grievance Program (IGP). *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).[FN1] First, the inmate must file a grievance complaint with the facility's IGP Clerk within twenty-one (21) calendar days of the incident. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. The grievance complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC), which has sixteen (16) calendar days from receipt to informally resolve the issue or conduct a hearing.[FN2] The IGRC must issue a written decision within two (2) working days of the conclusion of the hearing. Second, the inmate may appeal the IGRC decision to the Superintendent within seven (7) calendar days of receipt of the IGRC's decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the appeal. Third, the inmate may appeal to CORC within seven (7) calendar days of receipt of the superintendent's written decision. CORC is to render a final administrative determination within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, in order to complete the grievance process. Upon the completion of all three steps, "a prisoner may seek relief pursuant to 42 U.S.C. § 1983 in federal court." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) *(citing Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001)).

FN1. The provisions of the grievance procedure established by DOCS are set forth in 7 N.Y.C.R.R. §§ 701.1 *et seq.*

FN2. Allegations of employee misconduct bypass the IGRC and go directly to the superintendent for review. If the superintendent determines that the grievance is "a bona fide harassment issue," the superintendent assumes responsibility for the matter. If not, the grievance is returned to the IGRC for normal processing.

**\*4** The Second Circuit has suggested a three-pronged inquiry when the inmate plaintiff opposes a defendant's assertion that the inmate failed to exhaust his or her available administrative remedies. In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit stated:

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, [667-68 (2d. Cir.2004) ]. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, [695 (2d. Cir.2004) ], or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba* [v. *Wezner,* 366 F.3d 161, 163 (2d Cir.2004) ]. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, [675 (2d Cir.2004) ] (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill,* 380 F.3d at 686. While recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect *Woodford*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir.2007), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008) (noting that *Hemphill* recognized "nuances in the exhaustion requirement," the Court found that "[b]ecause we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has any bearing on them."); *Macias,* 495 F.3d at 43 n. 1 (we need not decide what effect *Woodford* has on *Hemphill's* holding that where administrative procedures are confusing "a reasonable interpretation of prison grievance regulations may justify an inmate's failure to follow procedural rules to the letter."). As has the Second Circuit, as well as the other district courts in this Circuit, this Court will apply the *Hemphill* three-part inquiry to the exhaustion claims. *See e.g., Butler v. Martin,* 07-CV-521 (FJS/GHL), 2010 WL 980421, *1 (N.D.N.Y. Mar. 15, 2010) (the magistrate judge "correctly applied the Second Circuit's three-part inquiry" for analyzing claims of non-exhaustion); *Winston v. Woodward,* 05 Civ. 3385, 2008 WL 2263191, *6 (S.D.N.Y. May 30, 2008) (collecting cases).

**\*5** To be "available" for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In addition, a court deciding this issue must apply an objective test and determine whether a similarly situated person of ordinary firmness would have deemed the administrative remedy available. *Hemphill,* 380 F.3d at 688.

"A plaintiff's failure to exhaust ... may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures." *Winston,* 2008 WL 2263191 at *9 (citing *Hemphill,* 380 F.3d at 688-89) (other citation omitted). However, alleged intimidation will provide a basis to excuse the filing of a grievance only against the person alleged to have engaged in the intimidation. *Snyder v. Whittier,* 05-CV-1284 (TJM/DEP), 2009 WL 691940, *9 (N .D.N.Y. Mar. 12, 2009); *Larry v. Byno,* 01-CV-1574 (TJM), 2006 WL 1313344, ----3-4

(N.D.N.Y. May 11, 2006).[FN3]

> **FN3.** Conclusory allegations of intimidation are not sufficient. In *Veloz v. New York,* the prisoner claimed that he placed his grievances in the mail, "but that his grievances were either misplaced or destroyed." 339 F.Supp.2d 505, 514 (S.D.N.Y.2004), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2006). The Court found it significant that plaintiff "offers no evidence that any particular officer thwarted his attempts to file [the grievances] ... His allegations 'stand alone and unsupported.' " *Id.* at 516 (quoting *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001)); *see also Winston,* 2008 WL 2263191, *10 (rejecting assertion that plaintiff failed to exhaust administrative remedies due to mail tampering because plaintiff failed "to put forth any corroborating evidence, either direct or circumstantial").

In addition, the Court must also consider whether "special circumstances" have been plausibly alleged, that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). Justification "must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Id.* at 678. Special circumstances may be found to exist, for example, where prison officials "inhibit an inmate's ability to utilize administrative grievance procedures;" where the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming; and where all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676.

Here, it is undisputed that administrative remedies were available to plaintiff through the Upstate IGP, which plaintiff has acknowledged and, in fact, utilized by filing numerous grievances. *See Mingues v. Nelson,* 96 CV

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

5396, 2004 WL 324898, *4 (S.D.N.Y. Feb.20, 2004) (the record is unmistakably clear "that an appropriate administrative procedure was available" to plaintiff who did not deny knowledge of the IGP). It is also clear that defendants have not forfeited the administrative remedy defense in this action. Defendants asserted plaintiff's failure to exhaust in their answer to the complaint. Dkt. No. 16 at 2.

Accordingly, the Court will consider whether plaintiff exhausted his administrative remedies with respect to the eight claims identified by defendants in their motion and, if not, whether defendants are estopped from asserting this defense or whether any "special circumstances" exist which might excuse plaintiff's failure to exhaust. These issues are addressed with respect to each of the eights claims, proceeding in chronological order by date of the underlying incident.[FN4]

> **FN4.** For purposes of the pending summary judgment motion, the facts are related in a light most favorable to plaintiff, as the non-moving party, with all inferences drawn in his favor. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

**\*6 February 15, 2005:** Plaintiff claims that on this date C.O. Howard threw "hot coffee" at plaintiff's cell slot. Compl. (Facts) at 3.

Defendants maintain that this incident is unexhausted because plaintiff did not file a timely grievance. Defs. MOL at 7. The first grievance filed by plaintiff in 2005 and recorded by the Upstate IGP was Grievance UST 23622-05, which was dated May 19, 2005, more than one month later. Gregory Aff. ¶¶ 7-8 and exs. A and B.[FN5] There is no record in the CORC database "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 10.

> **FN5.** Exhibit A is a copy of the computer printout of plaintiff's grievance records at Upstate for the years 2005-2007. In Grievance UST 23622-05, plaintiff describes the hot coffee incident as follows: "[C.O. Howard] threw the contents at my cell mate's face (hot coffee)."

Gregory Aff. ex. B. Plaintiff goes to state that "[m]y cell mate and I have both been advised that our complaints were never received, and time was allowed to expire!" *Id.*

According to plaintiff, he filed a complaint regarding the "hot coffee" incident on February 15, 2005, which "was held by staff" and "did not make it to the IGRC in time for processing at no fault of plaintiffs." Pl. Stmt. ¶¶ 2, 4. Plaintiff relies on a memorandum dated April 7, 2005 addressed to plaintiff from "L. Peary-Inmate Grievance Program." Pl. Stmt. ex. A. In this memorandum, Peary acknowledged that plaintiff submitted a complaint "dated 2/15/05" and advised plaintiff that the complaint was not processed as a grievance because it was received "outside the time frames for filing a grievance." *Id.* The memorandum goes on to state that if plaintiff provided "proof of mitigating circumstances within 7 days of the date of this correspondence," his complaint would be processed in accordance with the grievance procedures. *Id.* Plaintiff does not claim to have made a further submission as Peary advised. Rather, plaintiff states only that he "could not however appeal complaint due to being [an ongoing subject] of harassment." Pl. Stmt. ¶ 3.

Here, the record reflects that plaintiff did not file a timely grievance regarding the hot coffee incident and moreover, despite having been afforded an opportunity to mitigate his late filing, elected not do so. Plaintiff's unsupported assertion that he could not pursue his grievance remedies because he was being harassed by unidentified corrections personnel does not provide a basis for a finding of estoppel. *See* Snyder, 2009 WL 691940, *9. The record does not disclose a realistic fear of retribution on plaintiff's part sufficient to estop defendants from asserting the defense of non-exhaustion or otherwise justifying plaintiff's failure to exhaust.

Based upon the record before this Court, plaintiff did not file a timely grievance regarding the "hot coffee" incident, and there is no basis upon which to excuse that failure or to estop defendants from asserting that affirmative defense. This claim is dismissed.

**May 10, 2005:** Plaintiff claims that on this date C.O. Howard "took family photos, and magazines out of

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

[Plaintiff's] cell." Compl. (Facts) at 3.

Defendants urge dismissal of this claim as unexhausted because the records maintained at Upstate do not reflect a grievance from plaintiff regarding this incident, and no grievance appeal appears in the CORC records corresponding to either the date or the nature of the incident. Defs. MOL at 7; Gregory Aff. ¶ 8 and ex. A; Bellamy Aff. ex. A.[FN6]

> FN6. Exhibit A to the Bellamy Affidavit is a copy of the computer printout of plaintiff's grievance records at CORC for the years 2005-2008.

**\*7** Plaintiff admits that he did not file a grievance (or a grievance appeal) regarding this incident. Pl. Stmt. ¶¶ 5-7. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances exist which justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**May 19, 2005:** Plaintiff claims that on this date C.O. Howard engaged in "harassment, threats and misconduct." Compl. (Facts) at 3. Plaintiff filed Grievance UST 23622-05 dated May 19, 2005. Gregory Aff ex. B. In that grievance, plaintiff complained that C.O. Howard "badgered" him and, after first letting the juice containers fall off of the flap, "stacked the juice containers up 3 high so they could not fit [sic] throw cell slot." *Id.* Grievance UST-23622-05 was denied by the Superintendent on June 6, 2005. Gregory Aff. ¶ 9 and ex. B.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of his grievance to CORC. Defs. MOL at 8; Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits that he did not appeal the denial of grievance UST 23622-05 to CORC. Pl. Stmt. ¶¶ 8-10. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the affirmative defense of non-exhaustion or that his failure to

exhaust his administrative remedies is justified by special circumstances.

This claim is unexhausted and is dismissed.

**April 7, 2006:** Plaintiff claims that on this date C.O. Howard was verbally abusive to him during a pat frisk and denied him a telephone call concerning the death of a family member. Compl. (Facts) at 3. Plaintiff states that he "notified the Inspector General's Office" about this incident. *Id.*

Defendants seek dismissal of this claim on the ground that plaintiff did not exhaust his administrative remedies regarding this incident. Defs. MOL at 8. The grievance records at Upstate do not include a grievance from plaintiff regarding this incident. Gregory Aff. ¶ 11 and ex. A. There is no record in the CORC data base "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 11 and ex. A.

Plaintiff opposes summary judgment, relying on a letter of complaint regarding the April 7, 2006 incident which he sent to DOCS Commissioner Goord on April 7, 2006. Pl. Stmt. ¶¶ 11-12 and ex. C. In that letter, plaintiff complained about this incident and stated that C.O. Howard had been engaged in ongoing harassment of plaintiff. The letter was assigned # 083650. Pl. Stmt. ex. C. Plaintiff does not claim to have received a response to this letter. Plaintiff does not claim to have taken any further actions to exhaust his administrative remedies, nor does he claim that C.O. Howard "misled, threatened, or otherwise deterred" him from utilizing the IGP. *See Winston,* 2008 WL 2263191, at *9. Plaintiff admits that there was no appeal to CORC. Pl. Stmt. ¶ 13.

**\*8** Upon review, the Court finds that this claim is unexhausted. After *Woodford,* notice alone of an inmate's complaint is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance" and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; see *Snyder,* 2009 WL 691940, * 10 (plaintiff's complaints which led to investigation by DOCS Inspector

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

General, "while perhaps constituting substantive exhaustion, does not satisfy the PLRA's procedural exhaustion requirement."). Under *Woodford,* plaintiff cannot satisfy the PLRA's exhaustion requirement by filing a complaint with the superintendent. *Macias,* 495 F.3d at 44.

Because plaintiff did not comply with the established grievance protocol of the IGP, and in the absence of evidence demonstrating that defendants should be estopped from asserting non-exhaustion or that special circumstances exists which justify the failure, this claims is unexhausted and is hereby dismissed.

**August 7, 2006:** Plaintiff claims that on this date C.O. McGaw and C.O. Willette used excessive force against him during a strip search, causing serious injury. Plaintiff claims that C.O. Galiger and C.O. Green failed to intervene and protect him from the assault. Compl. (Facts) at 4-5. Plaintiff filed Grievance UST 27819-06 regarding this incident. *Id.* Grievance UST 27819-06 was denied by the Superintendent on September 13, 2006. Gregory Aff. ¶ 12 and ex. C.

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 8. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

In response, plaintiff claims that he timely appealed the denial of his grievance to CORC on September 18, 2006. Pl. Stmt. ¶¶ 14-16; Pl. MOL at 5, 12-13. Plaintiff relies on a copy of the Superintendent's response to Grievance UST 27819-06 which includes plaintiff's "Appeal Statement" dated September 18, 2006. Pl. Stmt. ex. B. Hand-written on that document (presumably by plaintiff) is the following: "Received on 9/18/06 filed on 9/18/06 CORC." *Id.* Plaintiff states that he could not place his appeal in "the designated grievance mail box" because at that time inmates at Upstate (a Special Housing facility) had no direct access to a grievance "mail box" but, rather, had to hand their grievance documents to a correction officer and rely on that person to physically place the documents in the box, which is what plaintiff did. Pl. Stmt. ¶ 16; Pl. MOL at 5. Plaintiff has also submitted a copy of a letter dated August 6, 2007 addressed to IGP Director

"Tomas G. Baben," regarding his appeal of Grievance UST 27819-06. Pl. Stmt. ex. B. Plaintiff stated in that letter that he had not received confirmation that his appeal of Grievance UST 27819-06 was received by CORC and expressed concern that the appeal might have been "intercepted by staff and never processed." *Id.* On the basis of these documents, plaintiff argues summary judgment dismissing this claim as unexhausted is unwarranted. Pl. MOL at 9-10.

**\*9** Defendants have not replied.

In *Finch v. Servello,* 06-CV-1448 (TJM/DRH), 2008 WL 4527758 (N.D.N.Y. Sept. 29, 2008), this Court denied the defendants' motion for summary judgment dismissing the plaintiff's claim on the ground of non-exhaustion, in light of the plaintiff's sworn statement that he requested his housing officer to send a letter to his superiors attesting to plaintiff's repeated efforts to file a grievance. This Court adopted the Report-Recommendation issued by Magistrate JudgeDavid R. Homer, which included the following analysis of the issue presented by the defendants' summary judgment motion:

Nevertheless, although implausible, Finch's testimony on this issue requires a determination of credibility, a determination that cannot be made on a motion for summary judgment. *See Dillon v. Morano,* 497 F.3d 247, 254 (2d Cir.2007); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 157 (2d Cir.1998) ("To the extent that these inconsistencies can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury."); *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.").

*Finch,* 2008 WL 4527758 at ----7-8; *see also, Ross v. Wood,* 05-CV-1112 (FJS/GHL), 2009 WL 3199539, *11 (N.D.N.Y. Sep. 30, 2009) (issues of fact raised by plaintiff in opposition to summary judgment, to which defendants did not reply, preclude summary judgment on issue of exhaustion).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

Here, plaintiff has submitted evidence regarding his appeal of the grievance to CORC sufficient to demonstrate that genuine issues of material fact exist such that summary judgment on this claim must be denied.

**September 14, 2006:** Plaintiff alleges that on this date C.O. Howard used excessive force against him, twisting the handcuffs on plaintiff's wrists in a way that caused him "to scream out in pain." Compl. (Facts) p. 7. Plaintiff submitted Grievance UST 28206-06. *Id.* This grievance was denied by the Superintendent on November 2, 2006. Gregory Aff. ¶ 13 and ex. D.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of Grievance UST 28206-06 to CORC. Defs. MOL at 8; Gregory Aff. ¶ 13; Bellamy Aff. ¶ 9.

Plaintiff admits that he did not appeal the denial of Grievance UST 28206-06 to CORC. Pl. Stmt. ¶¶ 17-19. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising this issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

In light of the foregoing, this claim is unexhausted and is therefore dismissed.

**December 20, 2006:** Plaintiff alleges that on this date C.O. McGaw and C.O. Willette allegedly harassed plaintiff, and "denied meals, and or supplies." Compl. (Summary of Facts). Plaintiff filed Grievance UST 29243-06 regarding this incident. *Id.*

**\*10** Defendants argue that plaintiff's claims regarding this incident are unexhausted because Grievance UST 29243-06 does not relate to the incident described in the complaint but, rather, relates to an entirely different incident which allegedly occurred on December 14, 2006 and which involved alleged verbal abuse by Officer "Waults and a refusal to provide Plaintiff with a broom for cell clean up." Defs. MOL at 9; *see* Gregory Aff. ¶ 16 and ex. E. Grievance UST 29243-06 was denied by the Superintendent on January 16, 2007. *Id.* There is no record that plaintiff appealed the denial of Grievance UST

29243-06 to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits the facts as outlined above. Pl. Stmt. at ¶¶ 23-26. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**March 15, 2007:** Plaintiff claims that on this day C.O. McGaw denied plaintiff his "diet tray" at the evening meal. Compl. (Summary of Facts). Plaintiff filed Grievance UST-30148-07. *Id.*

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 10. Defendants note that Grievance UST-30148-07 is dated February 7, 2007, and complains that C.O. McGaw denied plaintiff his evening meal on February 5, 2007-not March 15, 2007. *Id.; see* Gregory Aff. ¶ 17 and ex. F. Grievance UST-30148-07 was denied by the Superintendent on March 29, 2007. Gregory Aff. ¶ 17 and ex. F. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶ 9 and ex. A. Defendants argue that summary judgment is appropriate because claims arising out of the March 15, 2007 incident were not exhausted and, moreover, because even if plaintiff intended to refer in his complaint to an incident which occurred on February 5, 2007, that claim is also unexhausted because plaintiff did not appeal the denial of Grievance UST-30148-07 to CORC. Defs. MOL at 10.

In response, plaintiff admits the facts outlined above. Pl. Stmt. ¶¶ 27-30. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**(C) Merits of Plaintiff's Exhausted Claims**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

In addition to the matters discussed above, the complaint asserts claims arising out of three additional incidents. Complaint (Facts) at 3, 8; (Summary of Facts). Defendants acknowledge that plaintiff exhausted his administrative remedies with respect to these three claims. Defs. MOL at 9. Defendants nevertheless seek summary judgment dismissing these claims for failure to state a claim upon which relief may be granted for the violation of plaintiff's constitutional rights. *Id.* at 9-12.

**\*11** Plaintiff's remaining claims arise out of the following three incidents.[FN7]

> [FN7.] Plaintiff admits the relevant facts regarding these three incidents as set forth herein. Pl. Stmt. ¶¶ 32-43. Plaintiff has not set forth legal arguments in opposition to this aspect of defendants' motion for summary judgment.

**October 26, 2005:** Plaintiff claims that on this date C.O. Howard harassed and threatened him. Compl. (Facts) at 3. Plaintiff filed Grievance UST-25150-05 complaining that C.O. Howard intentionally "shoved" 2 containers of juice and 4 containers of milk through the feed slot of Plaintiff's cell, followed by a feed up tray, "purposely knocking them to the floor inside the cell." Gregory Supp. Aff. ex. G. The grievance also accused C.O. Howard of stating to plaintiff: "I bet you wont beat my next ticket." *Id.* Plaintiff complained that C.O. Howard's behavior was "unprofessional" and asked that he not be "harassed, set up, or verbally abused nor threaten by Officer Howard." *Id.* at 4, 6.

**August 16, 2006:** Plaintiff claims that on this date "Mr Willette have harassed, denied MEALS, and or supplies to the plaintiff." Compl. (Summary of Facts). Plaintiff filed Grievance UST-27855-06 complaining that a corrections officer identified as "Waults" (but said to be the officer who allegedly assaulted plaintiff on August 7, 2006; *i.e.* C.O. Willette) "refused to issue requested claims forms and grievances forms per his duty. ... I was also denied the morning meal during feed up by this Officer and Officer Allen." Gregory Supp. Aff. ex. H. Plaintiff asked in the grievance to be "assured of his safety" and to have the officer "reprimanded and told not to spit in peoples food." *Id.*

October 14, 2006: Plaintiff claims that on this date, during an escort to the visitor area, C.O. Howard "boasted" about his involvement in the alleged assault on plaintiff on August 7, 2006, and attempted to provoke plaintiff to violence by making racially offensive remarks. Compl. (Facts) at 8.[FN8] Plaintiff filed Grievance UST-28590-06 complaining that C.O. Howard "crossed the line yet again." Gregory Supp. Aff. ex. I. Plaintiff asked for an "order of protection" and for C.O. Howard to be fired or reassigned. *Id.*

> [FN8.] According to plaintiff. C.O. Howard made statements such as "go ahead take a shot," "we've got a boy coming through," and "come on bitch take a swing." *Id.*

Defendants characterize plaintiff's claims as arising under the Eighth Amendment, and argue that summary judgment should be granted dismissing these claims because they fail to state claims upon which relief may be granted. Defs. MOL at 10-12.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment "imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

*12 A claim alleging that the plaintiff's conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." Wilson v. Seiter, 501 U.S. 294, 297-98, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

It is well-settled that words alone, however violent, are not held to amount to an assault, or to constitute cruel and unusual punishment under the Eighth Amendment. Johnson v. Glick, 481 F.2d 1028, 1033 n. 7 (2d Cir.1973), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). In other words, § 1983 is "not designed to rectify harassment or verbal abuse." Gill v. Hoadley, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing Alnutt v. Cleary, 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)). Accordingly, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." Moncrieffe v. Witbeck, 97-CV-253 (NAM/DRH), 2000 WL 949457, *3 (N.D.N.Y. Jun. 29, 2000) (quoting Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998)); see also Cossey v. Killacky, 04-CV-6305CJS(P), 2004 WL 1960163, *2 (W.D.N.Y. Aug.16, 2004) (citing cases).[FN9]

FN9. A prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors "incited other inmates to assault [the plaintiff] ..., thereby placing him at grave risk of physical harm." Young v. Coughlin, 93 Civ. 262, 1998 WL 32518, *7 (S.D.N.Y. Jan.29, 1998). However, if the plaintiff fails to allege-with concrete facts, not conclusory assertions-that he has suffered an objectively "sufficiently serious" injury or that the corrections officer acted with a "sufficiently culpable state of mind," the claim must be dismissed. Dawes v. Walker, 239 F.3d 489, 494 (2d Cir.2001) (references to prisoner as "informant" or a "rat" in conversations with other inmate not sufficient to give rise to an inference that plaintiff actually faced a substantial risk of serious harm from other inmate); see Bouknight v. Shaw, 08 Civ. 5187, 2009 WL 969932, *4 (S.D.N.Y. Apr.6, 2009) (where plaintiff has not alleged any facts that, if proven, would establish that he ever faced actual or imminent harm, court will not assume that a serious risk existed merely because corrections officer spread rumors about him). Plaintiff makes no such claim in this action.

Actions which may reasonably be understood to been taken for purposes of harassment and abuse, but which did not pose a substantial risk of serious harm to the inmate, may also fall short of the requirement for a viable Eighth Amendment claim that the harm be, objectively "sufficiently serious." See, e.g., Benitez v. Locastro, 04-CV-423 (NAM/RFT), 2008 WL 4767439, *5 (N.D.N.Y. Oct. 29, 2008) (allegation that officers threw dirty mop water into plaintiff's cell and overflowed his toilet, even if true, constitute no more than de minimis actions best described as harassment, not cruel and unusual punishment); McFadden v. Solfaro, 95 Civ. 1148, 1998 WL 199923, ----2, 13 (S.D.N.Y. Apr.23, 1998) (prisoner's claim that a corrections officer regularly threw coffee, juice, and water into his cell and placed hair in his food tray was not a triable cause of action under the Eighth Amendment); see also Samuels v. Hawkins, 157 F.3d 557, 558 (8th Cir.1998) (prison guard's actions of throwing a liquid at plaintiff that did not harm him in any way were de minimis ).[FN10]

FN10. Similarly, a de minimis use of force will rarely suffice to state a constitutional claim. See Hudson, 503 U.S. at 9-10; Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

In this case, plaintiff claims that on two occasions, separated in time by nearly one year, C.O. Howard was verbally abusive to him.[FN11] Plaintiff also claims that on one of those occasions, C.O. Howard needlessly shoved his food through the feed up slot so that it fell to the floor of his cell. Plaintiff does not allege, nor are there any facts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

in the record which even suggest, that C.O. Howard's actions actually harmed plaintiff or posed a substantial risk of serious harm. Rather, the undisputed facts show that C.O. Howard engaged in conduct which, if true, was inappropriate and unprofessional, but which did not violate plaintiff's constitutional rights. Accordingly, the Court finds that plaintiff's claims against C.O. Howard arising out of the incidents on October 26, 2005 and October 14, 2006, do not state a claim upon which relief may be granted pursuant to § 1983 and are, therefore, dismissed.

> FN11. Plaintiff also alleges in his complaint that C.O. Willette "harassed" him on August 16, 2006. This claim is without factual support of any kind in either in the complaint or in Grievance UST-27855-06. Moreover, as noted above, plaintiff has not addressed the sufficiency of this claim in response to defendants' motion for summary judgment and it is, therefore, dismissed.

**\*13** Plaintiff claims that on August 16, 2006, C.O. Willette denied him meals and supplies. Compl. (Summary of Fact). In Grievance UST-27855-06, plaintiff complained that he was "denied the morning meal," and was refused "claims forms and grievances forms." Gregory Supp. Aff. ex. H. Such deprivations, alleged by plaintiff to have occurred only on one occasion, while not to be condoned, are nonetheless *de minimis* and do not rise to a level of constitutional significance. *See Parker v. Peek-Co,* 06-CV-1268 (GLS/DEP), 2009 WL 211371, *4 (N.D.N.Y. Jan. 27, 2009) (plaintiff's claim that he was "deprived of two meals on that date is *de minimis* and does not rise to a level of constitutional significance."); *Cagle v. Perry,* 04-CV-1151 (TJM/GHL), 2007 WL 3124806, * 14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation."); *see also Cruz v. Church,* 05-CV-1067 (GTS/DEP), 2008 WL 4891165, ----2, 12 (N.D.N.Y. Nov. 10, 2008) (summary judgment granted where plaintiff failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim).

Mindful of its obligation to construe the allegations of

the *pro se* complaint broadly to detect the strongest claim which, based upon the circumstances alleged, could be asserted by the plaintiff, *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008), the Court has considered whether the allegations of plaintiff's complaint that C.O. Willette denied him grievance forms and claim forms are sufficient to state a claim for the violation of plaintiff's First Amendment right to petition government for the redress of grievances.

It is well-established that a prison inmate has no constitutional right of access to an internal prison grievance process. *See Harnett v. Barr,* 538 F.Supp.2d 511, 522 (N.D.N.Y.2008); *Chadwick v. Mondoux,* 05-CV-975 (GLS/GJD), 2007 WL 2891655, *6 (N .D.N.Y. Sep. 28, 2007); *Rhodes v. Hoy,* No. 05-CV-836, 2007 WL 1343649, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"). Accordingly, plaintiff's allegations that C.O. Willette refused to provide him with grievance and/or claim forms on August 16, 2006, even if true, do not state a cognizable claim for the violation of plaintiff's First Amendment rights and this claim is dismissed. *See Graham v. Coughlin,* 86 CIV. 163, 2000 WL 1473723, *7 (S.D.N.Y. Sep.29, 2000) (the "occasional failure of prison personnel to provide plaintiff with grievance forms does not constitute a cognizable claim under § 1983"); *Harnett,* 538 F.Supp.2d at 522 (the refusal to process a grievance or the improper handling of a grievance does not rise to the level of a constitutional violation).

## III. CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is granted in part and denied in part. All of plaintiff's claims are dismissed with the exception of his claims against defendants McGaw, Willette, Galiger, and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006 (the "excessive force claims"). Defendants' motion for summary judgment dismissing the excessive force claims is denied because plaintiff has adduced evidence sufficient to show that a reasonable trier of fact could conclude that plaintiff exhausted his administrative remedies with respect thereto. Accordingly, it is hereby

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))


**\*14** ORDERED that defendants' motion for summary judgment (Dkt. No. 49) is **granted in part and denied in part** as set forth above; and it is further

ORDERED that defendant C.O. Howard is dismissed as a defendant in this action; and it is further

ORDERED that this matter is remanded to the assigned magistrate judge for a final pretrial conference on the excessive force claims, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Decision and Order on the parties.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Hooks v. Howard
Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ismail N. SMITH, Plaintiff,
v.
Commissioner GOORD; C.O. Matrese, Correctional
Officer, Coxsackie Correctional Facility; Ranze,
Coxsackie Correctional Facility; Bogardus, Correctional
Officer, Coxsackie Correctional Facility; Michaud,
Correctional Officer, Coxsackie Correctional Facility;
Noeth, Coxsackie Correctional Facility; John Doe,
Keeplock C.O., Coxsackie Correctional Facility, from
F-2 on 9/12/07; Sperry, Nurse, Coxsackie Correctional
Facility; John Doe, Physical Therapist from 8/7/08,
Coxsackie Correctional Facility; John Doe, Deputy
Commissioner of Programs, DOCS; John Doe, Deputy
Commissioner of Facilities; Murzda, Correctional
Officer, Coxsackie Correctional Facility; McDermot,
Lt., Coxsackie Correctional Facility; Rivera,
Superintendent, Coxsackie Correctional Facility;
Montusello,[FN1] Deputy Superintendent of Security; A.
Mtambu, Nurse, Defendants.

> FN1. The correct spelling of Defendant
> Montusello's name appears to be "Martuscello."
> *See* Dkt. No. 48, Acknowledgment of Serv.,
> dated Aug. 4, 2009. We shall refer to him using
> the correct spelling of his name.

Civ. No. 9:08-CV-1364 (NAM/RFT).

Aug. 9, 2010.
Ismail N. Smith, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate

Judge.

**\*1** *Pro se* Plaintiff Ismail N. Smith brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging
violations of his constitutional rights. On December 22,
2009, Defendants Goord, Rivera, and Martuscello filed a
Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6).
Dkt. No. 67. By their Motion, the moving Defendants
assert that Plaintiff's supervisory liability claims are not
facially valid and that Plaintiff has failed to plead any
personal involvement on their part. *Id.* Plaintiff was
ordered to file a response to the Motion no later than
January 8, 2010. *Id.* On January 6, 2010, Plaintiff filed a
Letter-Motion seeking an extension to file a response,
which the Court granted, extending his deadline to March
8, 2010. Dkt. No. 70; Text Order, dated Jan. 6, 2010. On
March 26, 2010, Plaintiff filed a Motion to Amend his
Complaint for a third time,[FN2] but did not otherwise
address the pending Motion to Dismiss. Dkt. No. 74. By
his Proposed Third Amended Complaint, Plaintiff, in large
measure, reiterates the allegations in the Second Amended
Complaint. *Compare* Dkt. No. 65, Second Am. Compl.
*with* Dkt. No. 74, Proposed Third Am. Compl. In terms of
substantive changes contained in the Proposed Third
Amended Complaint, Plaintiff seeks to add claims against
two new defendants, Correction Officers McKintyre and
Stevenson, as well as new claims against Defendant
Lieutenant ("Lt.") McDermott. Proposed Third Am.
Compl. at ¶¶ 27-31 & 40. Defendants collectively filed a
Partial Opposition to the Third Motion to Amend, arguing
that Plaintiff's proposed claims against McKintyre are
facially invalid and implausible, but otherwise registering
no opposition to the remainder of that Motion. Dkt. No.
75. To date, Plaintiff has not responded to the Motion to
Dismiss by Goord, Rivera, and Martuscello. *See*
*generally* Case Dkt.

> FN2. The original Complaint was filed on
> December 22, 2008. Dkt. No. 1. Plaintiff filed
> his First Motion to Amend on June 15, 2009,
> which, being unopposed by Defendants, was
> granted. Dkt. No. 41. On September 21, 2009,
> Plaintiff filed a Second Motion to Amend, which
> was again granted after Defendants offered no
> substantive opposition to the Motion. Dkt. No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

64. Plaintiff's Second Amended Complaint was docketed on November 24, 2009. Dkt. No. 65. Defendants Goord, Rivera, and Martuscello filed their Motion to Dismiss on December 22, 2009. Dkt. No. 67.

Because the Proposed Third Amended Complaint does not in any way add to or subtract from Plaintiff's claims against Defendants Goord, Rivera, and Martuscello, we shall begin by addressing their Motion to Dismiss and then proceed to Plaintiff's Third Motion to Amend.

## I. DEFENDANT'S MOTION TO DISMISS

### A. Summary of Plaintiff's Claims

As the Motion to Dismiss is limited to Plaintiff's claims against Goord, Rivera, and Martuscello, we need not recite the entirety of Plaintiff's allegations in order to put their Motion into context. Instead, a brief overview of Plaintiff's claims will suffice. Such overview is derived from the factual allegations in Plaintiff's Second Amended Complaint, which, in accordance with the applicable standard under FED. R. CIV. P. 12(b)(6), must be taken as true for the purposes of addressing the Motion to Dismiss. *See infra* Part I.B.

At all times relevant to this action Plaintiff was incarcerated at the Coxsackie Correctional Facility ("Coxsackie"). Dkt. No. 65, Second Am. Compl. at p. 7, Intro. Plaintiff claims that Defendants subjected him to a sustained serious of threats and harassment, Second Am. Compl. at ¶¶ 1-5, issued false misbehavior reports against him in retaliation for complaints he filed, Second Am. Compl. at ¶¶ 10-15, displayed deliberate indifference to his medical needs, Second Am. Compl. at ¶¶ 7-9 & 24-26, and finally, on September 12, 2007, he was beaten and subjected to excessive force by Defendants Ramsey, Bogardus, Noeth, Matrease, and Michaud, Second Am. Compl. at ¶¶ 17-20. Plaintiff also brings supervisory liability claims based on the above alleged constitutional violations against Defendants Goord, Rivera, Martuscello, and John Does Deputy Commissioner of Facilities and Deputy Commissioner of Programs. *Id.* at ¶¶ 37-41. We provide more detail regarding those supervisory claims in our discussion below. *See infra* Part I.C.

### B. Standard of Review

**\*2** On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997)* (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).* Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal, --- U.S. ---- 129 S.Ct.* at 1950 (citing *Twombly* ). "A claim has facial plausibility when the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, --- U . S. ---- 129 S.Ct. at 1949.* This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

### C. Personal Involvement

**\*3** The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*" *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948.

Nevertheless, if a plaintiff seeks to bring a *§ 1983* action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional

violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Defendants Goord, Rivera, and Martuscello assert that Plaintiff's allegations fail to state facially valid claims against them under § 1983. Plaintiff's supervisory liability claims against these Defendants are stated in the Second Amended Complaint [FN3] as follows:

> FN3. Plaintiff brings identical claims against these Defendants in his Proposed Third Amended Complaint. *See* Proposed Third Am. Compl. at ¶¶ 42-47.

37. Prior to plaintiff ISMAIL N SMITH's arrival at Coxsackie Correctional Facility, Commissioner Goord, Rivera, Montucello, Deputy Commissioner of Facilities, [and] Deputy Commissioner of Programs John Doe developed and maintained policies or customs/or upheld policies or customs exhibiting deliberate indifference to the constitutional rights of inmates in DOCS and Coxsackie Correctional Facility which caused the violation of ISMAIL N SMITH's rights.

38[1].[FN4] It was the policy and/or custom of the supervisor defendant Goord, et al., to inadequately supervise and train its police officers [and] corrections officers and civilians including the defendants, thereby failing to adequately discourage further constitutional violations on the part of its staff members (correctional officers, civilians). The Supervisor defendants Goord, et al. did not require appropriate in-service training or re-training of correction officers and civilian staff who were known to have engaged in staff misconduct.

> FN4. In his Second Amended Complaint, Plaintiff numbered two consecutive paragraphs "38." For ease of reference, we have designated them "38[1]" and "38[2]" in order.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

38[2]. It was the policy and/or customs of the Supervisor Defendants Goord, et al., to inadequately and improperly investigate inmates['] complaints of staff misconduct, and acts of misconduct were instead tolerated by the Supervisor Defendants Goord, et al., including but not limited to, the following incidents mentioned [in this Second Amended Complaint].

**\*4 39.** It was a policy and/or custom of the Supervisor Defendants to hire unqualified[ ] Correction Officer[s] and Civilians.

40. As a result of the above described policies and customs, correction officers and civilian staff of Coxsackie Correctional, including the defendants, believed that their actions would not be properly monitored by supervisory officials and that misconduct would not be investigated or sanctioned, but would be tolerated.

41. The above described policies and customs demonstrate a deliberate indifference on the part of the policymaking Supervisor Defendants Goord, et al., to the constitutional rights of inmates within DOCS and Coxsackie Correctional and were the cause of the violations of plaintiff's rights ....

Second Am. Compl. at ¶¶ 37-41.

Thus, Plaintiff attempts to impute supervisory liability on the moving Defendants owing to their failure to (1) supervise and train subordinates, (2) investigate inmate complaints, and (3) hire qualified correctional officers and staff. *Id.* Plaintiff states that these failures amounted to formal or informal policies and/or customs that directly led to the violation of inmates' constitutional rights, including his own. *Id.*

The moving Defendants contend that the allegations quoted above are conclusory and do not amount to facially plausible supervisory liability claims. We agree. While Plaintiff asserts that the moving Defendants failed to supervise and train their subordinates, he does not allege any facts as to how they failed to do so. *See generally* Second Am. Compl. Similarly, Plaintiff does not explain

the circumstances under which any of the moving Defendants failed to adequately investigate constitutional violations, including those alleged in the Second Amended Complaint. *Id.* In that respect, Plaintiff does not allege to have filed any grievance or complaint with or against the moving Defendants, nor that any such Defendant failed to act on or take steps to remedy a wrong after being informed of one. *Id.* Finally, Plaintiff does not explain how the correction officers hired by the moving Defendants were unqualified. *Id.* In sum, these supervisory liability allegations amount to nothing more than a claim based on the theory of *respondeat superior,* which, as discussed above, is insufficient to state a valid claim under § 1983. A defendant cannot be held liable simply because of his supervisory position. *Wright v. Smith,* 21 F.3d at 501; *see also Scaccia v. County of Onondaga, New York,* 2009 WL 498563, at \*11 (N.D.N.Y. Dec. 15, 2009) (dismissing claims against supervisory defendants where plaintiff's claims "hinge[d] entirely on their roles as supervisors of individuals who (allegedly) violated [his] constitutional rights" and there were "no facts plausibly suggesting how [the supervisory defendants] failed to train and/or supervise their subordinates."); *Paterson v. Goord,* 2008 WL 623123, at \*7 (N.D.N.Y. Mar. 4, 2008) (dismissing complaint against supervisory defendants when plaintiff's conclusory allegations failed to implicate their personal involvement).

**\*5** For all the above reasons, it is recommended that the Motion to Dismiss be **granted in its entirety** and that Defendants Goord, Rivera, and Martuscello be **dismissed** from this action. Moreover, because Plaintiff's only allegations against Defendants John Doe Deputy Commissioner of Facilities and John Doe Deputy of Commissioner of Programs are the same accusations brought against the moving Defendants, *see* Second Am. Compl. at ¶¶ 37-41, they should be **dismissed** from this action for the same reasons stated above and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). *See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at \*7 (N.D.N.Y. Mar. 28, 2008) (citing 28 U.S.C. § 1915(e)(2)(B)(ii) and noting that "even where a defendant has not requested dismissal based on the failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim[.]"). Because Plaintiff has failed to state a valid

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

claim against these John Does, allowing him the opportunity to properly identify and serve these unnamed Defendants would be an exercise in futility.

## II. PLAINTIFF'S THIRD MOTION TO AMEND

### A. Motion to Amend Standard

FED. R. CIV. P. 15(a) states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." *Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003). Indeed, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Kropelnicki v. Siegel,* 290 F.3d 118, 130 (2d Cir.2002) (citing *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 271-72 (2d Cir.1996)). District courts are vested with broad discretion to grant a party leave to amend the pleadings. *See Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998).

In this instance, Defendants assert that Plaintiff's proposed claims against Corrections Officer Mckintyre are futile and, as such, his Third Motion to Amend should be denied as to those proposed claims. Dkt. No. 75, Defs.' Resp. in Opp'n to Pl.'s Third Mot. to Am. The Second Circuit has stated that where futility is raised as an objection to the motion to amend, and

[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend. *See, e.g., Foman v. Davis,* 371 U.S. at 182, 83 S .Ct. at 230 (denial not abuse of discretion where amendment would be futile); *Health-Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("where ... there is no merit in the Proposed amendments, leave to amend should be denied"); *Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case).

*6 *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

As futility is an appropriate basis for denying leave to

amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). For a review of that standard, see Part I.B above.

In this case, Defendants assert that Plaintiff's proposed claims against Mckintyre are futile because they fail to state a valid claim under § 1983 and because they are barred by the applicable statute of limitations. Dkt. No. 75, Defs.' Resp. Plaintiff seeks to add the following allegations against Mckintyre: (1) On May 12, 2006 and up to March 26, 2007, Mckintyre consistently harassed him, Proposed Third Am. Compl. at ¶ 27; (2) On May 12, 2006, Mckintyre wrote a false misbehavior report against Plaintiff, prompting Plaintiff to file a grievance against Mckintyre, Proposed Third Am. Compl. at ¶ 28; (3) In March 2007, Plaintiff was transferred to Mckintyre's housing unit and threatened by Mckintyre, Proposed Third Am. Compl. at ¶ 29; (4) On March 26, 2007, after Mckintyre threatened to take adverse actions against him, Plaintiff saw Mckintyre and Stevenson redacting a piece of paper together. When they finished, Mckintyre and Stevenson confronted Plaintiff with a letter of complaint that Plaintiff and another inmate intended to send to the A.C.L.U. regarding ongoing constitutional violations at Coxsackie, which Mckintyre and Stevenson characterized as "gang material," and then proceeded to lock Plaintiff in his cell. At his ensuing disciplinary hearing, Plaintiff saw that in the text of the letter to the A.C.L.U., each letter C was crossed out, a symbol he recognized to be gang-related. Plaintiff asserts that Mckintyre and Stevenson forged the redactions to the letter and filed a fabricated misbehavior report against him. Proposed Third Am. Compl. at ¶¶ 30-31.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

*Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Thus, the first and third of the above proposed allegations against Mckintyre are facially inadequate and therefore are futile. With respect to Plaintiff's second claim, that Mckintyre issued a false misbehavior report against him, such claim is also deficient because there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar. 31, 2005). While inmates may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff does not allege that the alleged May 12, 2006 misbehavior report was motivated by retaliatory animus. In that respect, we note that the Proposed Third Amended Complaint states that Plaintiff filed a grievance against Mckintyre *after* he received the allegedly false misbehavior report. Proposed Third Am. Compl. at ¶ 28.

*7 In contradistinction to his first three proposed allegations against Mckintyre, Plaintiff's fourth allegation, liberally construed, asserts a valid retaliation claim. In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted). Here, Plaintiff alleges that in response to a grievance he filed against Mckintyre after an alleged incident of harassment on May

12, 2006, Mckintyre colluded with Stevenson in March 2007, after Plaintiff was relocated to their housing unit, to forge gang insignia on a legitimate letter intended to be sent to the A.C.L.U., causing Plaintiff to be disciplined and confined in keeplock. Plaintiff also alleges that Mckintyre put Plaintiff on notice that he was going to retaliate against him, stating to Plaintiff upon his arrival at the cell block that "your [sic] in my house now and you better be on point cause I'm out to get you, you're not gonna last up here very long."

Filing grievances is protected conduct under the First Amendment, *see Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), and Plaintiff has alleged a plausible connection between that conduct and the alleged retaliatory acts taken.[FN5] Therefore, we find that Plaintiff's proposed retaliation claim against Mckintyre is facially valid.

> **FN5.** Although it is unclear, Plaintiff may have also intended to assert that the drafting of the complaint letter to the A.C.L.U. was protected conduct that caused retaliatory acts to be taken against him.

Defendants also argue that Plaintiff's proposed claims against Mckintyre are futile on statute of limitations grounds. In § 1983 actions, the applicable statute of limitations is a state's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002). In New York, a three-year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well. *Id.; see also* N.Y.C.P.L.R. § 214(5). Federal constitutional claims accrue when the plaintiff "knows or has reason to know" of the injury that is the basis for his action. *Pauk v. Bd. of Tr. of City Univ. of New York,* 654 F.2d 856, 859 (2d Cir.1981); *see also Connolly v. McCall,* 254 F.3d 36, 40-41(2d Cir.2001). In this case, Plaintiff alleges that Mckintyre retaliated against him on March 26, 2007, the date such claim accrued.[FN6] Proposed Third Am. Compl. at ¶ 30. Plaintiff's Third Motion to Amend, dated March 25, 2010, was filed on March 26, 2010. Dkt. No. 74. Thus, Plaintiff's retaliation claim against Mckintyre, even assuming it does not relate back to the filing of the original Complaint, was timely filed within the three-year statute of limitations.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3488148 (N.D.N.Y.)

(Cite as: 2010 WL 3488148 (N.D.N.Y.))

FN6. Because we find Plaintiff's other proposed claims against Mckintyre to be facially invalid, we need not discuss whether or not they fall within the statute of limitations.

Therefore, it is recommended that Plaintiff's Third Motion to Amend be **granted in part** and **denied in part** in accordance with the above opinion. Plaintiff's Motion is **denied** with respect to his proposed claims against Mckintyre, save his retaliation claim. Moreover, the allegations against the supervisory Defendants, which were identical in both his Second Amended Complaint and Proposed Third Amended Complaint, fail to state a valid cause of action under § 1983 and are therefore futile as well. As such, Plaintiff is directed to file a Third Amended Complaint consistent with this Order that does not include the aforementioned futile claims.

### III. CONCLUSION

*8 For the reasons stated herein, it is hereby
**RECOMMENDED,** that the Motion to Dismiss the Second Amended Complaint (Dkt. No. 67) brought by Defendants Goord, Rivera, and Martuscello be **GRANTED;** and it is further

**RECOMMENDED,** that Plaintiff's Third Motion to Amend the Second Amended Complaint be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt the above recommendations, that Plaintiff be ordered to file a Third Amended Complaint with the Clerk of the Court *within thirty (30) days of such adoption;* and it is further

**RECOMMENDED,** that Plaintiff be ordered to omit within any Third Amended Complaint his facially invalid and/or futile claims against Defendant Mckintyre and Defendants Goord, Rivera, Martuscello, John Doe Deputy Commissioner of Facilities, and John Doe Deputy Commissioner of Programs. Should a Third Amended Complaint be filed, the Clerk shall forward such pleading to this Court for review to ensure compliance with the

Court's directives prior to issuing summonses; and it is further

**RECOMMENDED,** that should the District Court adopt this Report-Recommendation, there will still be two John Doe Defendants remaining. Plaintiff should be forewarned that with respect to John Doe, Keeplock C.O., and John Doe, Physical Therapist, the U.S. Marshals cannot effect service on a "John Doe" Defendant. In the event that Plaintiff wishes to pursue his claims against these Defendants, he shall take reasonable steps to ascertain their identity. Plaintiff may then file a motion to amend his complaint and seek leave of the Court to add such individuals, by name, as Defendants to this lawsuit. Plaintiff should be further advised that if these individuals are not timely served, this action will be dismissed as against them; and it is further

**ORDERED,** that the Clerk send a copy of this Order to the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Smith v. Goord
Slip Copy, 2010 WL 3488148 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3488139 (N.D.N.Y.)

(Cite as: 2010 WL 3488139 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Ismail N. SMITH, Plaintiff,
v.
Commissioner GOORD; C.O. Matrese, Correctional Officer, Coxsackie Correctional Facility; Ranze, Coxsackie Correctional Facility; Bogardus, Correctional Officer, Coxsackie Correctional Facility; Michaud, Correctional Officer, Coxsackie Correctional Facility; Noeth, Coxsackie Correctional Facility; John Doe, Keeplock C.O., Coxsackie Correctional Facility, from F-2 on 9/12/07; Sperry, Nurse, Coxsackie Correctional Facility; John Doe, Physical Therapist from 8/7/08, Coxsackie Correctional Facility; John Doe, Deputy Commissioner of Programs, Docs; John Doe, Deputy Commissioner of Facilities; Murzda, Correctional Officer, Coxsackie Correctional Facility; McDermot, Lt., Coxsackie Correctional Facility; Rivera, Superintendent, Coxsackie Correctional Facility; Montusello,[FN1] Deputy Superintendent of Security; A. Mtambu, Nurse, Defendants.

FN1. The correct spelling of Defendant Montusello's name appears to be "Martuscello." *See* Dkt. No. 48, Acknowledgment of Serv., dated Aug. 4, 2009. We shall refer to him using the correct spelling of his name.

No. 9:08-CV-1364.

Aug. 30, 2010.

Ismail N. Smith, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Randolph E. Treece, duly filed on the 9th day of August 2010. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Smith v. Goord
Slip Copy, 2010 WL 3488139 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

**DISCUSSION**

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote

letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

> FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

> FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Mativn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

Feb. 25, 2010.
**REPORT AND RECOMMENDATION**

THEODORE H. KATZ, United States Magistrate Judge.
  **\*1 TO: HON. RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE**
  Plaintiff Larry Williams ("Plaintiff"), proceeding *pro se,* brings this action against Defendants the United States of America, the United States Marshal's Service ("USMS"), Detention Officers Luis Figueroa, Donny LaRosa, Thomas Ventiere, A.J. Krause, and unnamed detention officers John Does Nos. 4, 6, 7, and 8 (collectively, "Defendants"), alleging that they violated his rights under the First, Fifth, Sixth, and Eighth Amendments to the United States Constitution. Plaintiff asserts his claims against Defendants Figueroa, LaRosa, Ventiere, Krause, and John Does Nos. 4, 6, 7, and 8 (collectively, the "Individual Defendants") in their official as well as individual capacities.

  Defendants have moved to dismiss the action pursuant to Rules 12(b)(1), (5), and (6) of the Federal Rules of Civil Procedure. Defendants contend that the Court lacks subject matter jurisdiction, Plaintiff fails to state a claim upon which relief can be granted, and Plaintiff has failed to serve Defendants within 120 days of the filing of the Amended Complaint. The case was referred to this Court for a Report and Recommendation on Defendants' motion. For the reasons that follow, this Court recommends that Defendants' motion be granted.

**BACKGROUND**

  The events at issue in this action took place while Plaintiff was involved in criminal proceedings in the Southern District of New York ("S.D.N.Y."). Plaintiff alleges that the Individual Defendants, employees of the USMS assigned to the S.D.N.Y., violated his constitutional rights by mistreating him when they transported him to and from the S.D.N.Y. courthouse, and while he was in the courthouse's holding cells during the course of his criminal trial. Unless otherwise noted, the following facts are taken from Plaintiff's Amended Complaint, and assumed to be true for purposes of Defendants' motion to dismiss. (*See* Amended Complaint, dated Jan. 7, 2009 ("Am.Compl.").)

**I. The Incidents of 2004 through 2006**

  On February 8, 2004, Defendant Figueroa transported Plaintiff and other inmates from the Metropolitan Detention Center ("MDC"), where Plaintiff was incarcerated during his criminal trial, to the S .D.N.Y. courthouse. (*See* Am. Compl. ¶ 4.) During the trip, Defendant Figueroa began to discuss another inmate's case, who was in protective custody with one of Plaintiff's co-defendants in his criminal case. (*See id.* ¶ 5.) Plaintiff told Defendant Figueroa that "such discussions should not take place in the presence of inmates." (*See id.* ¶ 6.) In response, Defendant Figueroa called Plaintiff a "rat," which, according to Plaintiff, put his "life in jeopardy." (*See id.* ¶ 7.) Defendant Figueroa then told Plaintiff that he would be placed in the "Zebra Tank"-a solitary-confinement cell at the courthouse that was typically reserved for inmates who were cooperating with the government. (*See id.* ¶ 8.) Upon arrival at t he courthouse, Plaintiff was placed in the Zebra Tank. (*See id.*)

  **\*2** On March 1, 2004, during another trip to the S.D.N.Y. courthouse, Defendant Figueroa told another inmate on the bus-one of Plaintiff's co-defendants in his criminal proceeding-that Plaintiff would be placed in the Zebra Tank every time he went to the courthouse. (*See id.* ¶¶ 9-10.) He told Plaintiff, "You don't know who you are messing with. I'm from the street too." (*Id.* ¶ 11.)

  When they arrived at the courthouse, Defendant LaRosa escorted the inmates inside the building and toward the holding cells, while Defendant Figueroa

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

walked side-by-side with Plaintiff. (*See id.* 12.)

All of the prisoners were restrained with leg shackles, as well as handcuffs connected by chains to waist restraints. (*See id.* ¶ 13.) When the group reached an area of the building outside of the U.S. Marshal's office, Defendant Figueroa encountered Defendant Ventiere, and told him to make sure that Plaintiff was sent to the Zebra Tank. (*See id.* ¶ 14.) Defendant Ventiere instructed Plaintiff to step out of the line and stand by the wall opposite the other inmates. (*See id.* ¶ 15.) Plaintiff complied, but informed Defendant Ventiere that he would like to speak to a supervisor whenever possible. (*See id.* ¶ 16.)

At that point, Defendant Figueroa grabbed Plaintiff and "slammed him back into the wall." (*Id.* ¶ 17.) Defendant Ventiere joined Defendant Figueroa, and together they began "manhandling, choking, wrestling, and otherwise using excessive force" on Plaintiff as they moved him down the hall and into the Zebra Tank. (*Id.* ¶ 18.) When they arrived, they "smashed" Plaintiff into the metal cell door and the iron cell bars, and finally "slammed" Plaintiff into the metal bench. (*See id.* ¶ 19.) They then punched Plaintiff in the head and back, leaving him in a state of semiconsciousness. (*See id.* ¶¶ 21-22.) Plaintiff remained in restraints during this incident and was unable to physically defend himself. (*See id.* ¶ 20.)

After Defendants Figueroa and Ventiere left, Plaintiff "managed to use the toilet in the Zebra Tank and then fell to the floor." (*See id.* ¶ 23.) Defendants Krause and John Doe No. 4, who were standing nearby, told Plaintiff to get up, because "it did not look good for the camera." (*Id.* ¶ 24.) Plaintiff complied, afraid that he would be subjected to further assault. (*See id.*) Plaintiff was later taken to the courtroom by Defendants Ventiere and John Doe No. 4, where his attorney "took note of the effects of the assault." (*See id.* ¶¶ 25-26.) Plaintiff was not offered medical assistance by any of the Individual Defendants. (*See id.* ¶ 27.)

After Plaintiff's court appearance that day, Defendant Figueroa replaced Plaintiff's restraints for the trip back to the MDC. (*See id.* ¶ 28.) According to Plaintiff, Defendant Figueroa applied the restraints "unduly tight," inflicting

"considerable additional pain." (*Id.*) When he arrived at the MDC, Plaintiff requested treatment by a physician's assistant for his injuries. (*See id.* ¶ 29.) A physician's assistant refused to examine Plaintiff's injuries, but prescribed "two pills," and recommended that Plaintiff file a sick-call form. (*See id.* ¶ 30.)

**\*3** Plaintiff completed and filed the form the following morning, March 2, 2004. (*See id.* ¶ 31.) Several hours later, Plaintiff was taken to the Special Housing Unit ("SHU"), where he informed SHU Lieutenant Wilkens of the events of earlier in the day. (*See id.* ¶ 32.) Wilkens had Plaintiff examined by a physician's assistant, and photographed Plaintiff's bruises and injuries so that Bureau of Prisons officers would not be mistakenly blamed for the assault. (*See id.*)

The following day, March 3, 2004, Plaintiff was "spitting up blood," and was taken to a local hospital for further examination. (*See id.* ¶ 33.) The hospital prescribed pain medication and scheduled a follow-up examination for the following week. (*See id.*) Plaintiff did not receive medication until March 18, 2004. (*See id.*) MDC staff, "at the behest of the defendants," kept Plaintiff in SHU confinement until March 30, 2004. (*See id.* ¶ 34.)

As a result of Figueroa's and Ventiere's actions on March 1, 2004, Plaintiff "suffer[ed] from disorientation, and had difficulty swallowing food." (*Id.* ¶ 35.) Plaintiff had lacerations, bruising, and swelling on parts of his arms, legs and back. (*See id.* ¶ 36.) Plaintiff complained of "[d]izziness, faintness, and breathing problems." (*Id.*) In addition, Plaintiff claims that he "suffered from emotional anguish and psychological distress," and requires psychiatric treatment and medication for depression, psychosis, and anxiety. (*See id.* ¶ 37.)

On March 23, 2004, Plaintiff was again taken to the courthouse in order to attend a suppression hearing of one of his codefendants. (*See id.* ¶ 40.) He spent approximately six hours in the Zebra Tank, and was returned to the MDC several hours after his co-defendants, at the end of the day. (*See id.*) During this time, Plaintiff alleges that the Individual Defendants called him a "rat," and "humiliated [him] with jokes and teasing about the complaints made following the assault of March 1." (*See*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

*id.*) This treatment left Plaintiff so uncomfortable and mistrustful that he did not want to eat the food that the Individual Defendants gave him. (*See id.*)

Approximately one week later, on March 29, 2004, Plaintiff claims that the Individual Defendants "lost" his legal folder, which contained "valuable legal materials and strategies concerning Plaintiff's suppression hearing." (*Id.* ¶ 41.) Plaintiff does not specify which of the Individual Defendants lost these papers.

On April 23, 2004, Defendant Figueroa "continued his constant habit of taunting and teasing Plaintiff." (*Id.* ¶ 42.) On May 14, 2004, the Individual Defendants again put Plaintiff in the Zebra Tank. (*See id.* ¶ 43.) After Plaintiff complained of the cold temperature, Defendant John Doe No. 6 told Plaintiff "that's your problem." (*Id.*) Plaintiff inquired as to John Doe No. 6's name, but he did not provide it to Plaintiff. (*See id .*) Plaintiff was later placed in a regular holding cell. (*See id.*)

**\*4** While in the regular holding cell, Defendant Figueroa approached Plaintiff and asked "What's wrong?" while laughing. (*See id.* ¶ 44.) Although Plaintiff had arrived at the courthouse at 8:00 a.m. that morning, Plaintiff was not returned to MDC custody until approximately 8:30 p.m. (*See id.*) Plaintiff alleges that a similar delay occurred several months later, on August 16, 2004. (*See id.* ¶ 45.)

In September and October 2004, during Plaintiff's criminal trial, the Individual Defendants subjected Plaintiff to "constant taunting and harassment" that he alleges "negatively effected [his] due process and right to a fair trial." (*Id.* ¶ 46.) During this time period, Defendant John Doe No. 7 told Plaintiff, "I don't know why you are going to trial, you will never win," and on one occasion, pushed Plaintiff while he was walking from the courtroom. (*Id.* ¶¶ 47, 49.) Defendant John Doe No. 8 called Plaintiff a "crybaby" after he cried at his criminal trial. (*See id.* ¶ 50.) Plaintiff also alleges that one of the Individual Defendants-unspecified by Plaintiff-told Plaintiff that if he "pissed them off[, Plaintiff would] suffer a worse fate than before ." (*Id.* ¶ 48.) At the conclusion of Plaintiff's trial, on October 27, 2004, Defendant John Doe No. 7 told Plaintiff, "You're going to Leavenworth," and "You'll get

what you deserve." (*Id.* ¶ 51.) Plaintiff alleges that, in December 2005, at another criminal hearing, he complained about the Individual Defendants' "constant and continued mistreatment of Plaintiff." (*Id.* ¶ 52.)

Finally, on May 5, 2006, Plaintiff claims that Defendant Ventiere "popped from out of a door of a room with a large one-way mirror" as Plaintiff was being escorted to a holding cell by a USMS officer. (*Id.* ¶ 53.) Plaintiff had been telling the officer about the previous incidents with the Individual Defendants when Defendant Ventiere said, "I heard that, and I'll teach you a lesson." (*Id .* ¶ 53.) Plaintiff was returned to a holding cell, where he sat in "utter fear, not knowing if something would happen." (*Id.*) Defendant Ventiere took no further action against Plaintiff, but Plaintiff was kept in the holding cell until the last bus back to the correctional facility. (*See id.*)

## II. The Filing and Service of the Complaint

Plaintiff filed this action on February 28, 2007.[FN1] In his initial Complaint, he named only "John Does 1-11, sued in their individual capacities" as Defendants. (*See* Complaint, dated Feb. 28, 2007 ("Compl."), at 1.) Plaintiff's Complaint was stamped "received" by the Court's Pro Se Office on March 9, 2007, but was not docketed until April 14, 2007. On August 10, 2007, Plaintiff mailed a service package to the USMS. The paperwork was returned to Plaintiff on August 27, 2007, indicating that the Complaint could not be served without the names and addresses of Defendants. Plaintiff then wrote to the Court on September 5, 2007, requesting additional time to serve Defendants and assistance in obtaining the identity of the then-John Doe Defendants. (*See* Pl .'s Ltr., dated Sept. 5, 2007.) After Plaintiff's request went unanswered, he submitted a second letter to the Court on October 10, 2007. (*See* Pl.'s Ltr., dated Oct. 10, 2007.)

> FN1. It is well-settled that, as a *pro se* prisoner, Plaintiff's papers are deemed filed on the date that he hands them over to prison officials to be mailed. *See Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 2382 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying *Houston* to constitutional tort suits). Absent evidence to the contrary, the Court assumes that Plaintiff gave his Complaint to prison officials to mail on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the date he signed it, February 28, 2007. *See, e.g. Frith v. Hill,* No. 07 Civ. 5899(JSR), 2009 WL 3073716, at \*8 n. 4 (S.D.N.Y. Sept. 23, 2009); *Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

**\*5** On October 30, 2007, District Judge Richard J. Sullivan ordered the United States Attorney's Office ("USAO") to identify the officers described in the Complaint, if possible, and to provide each officer's name and last known address to Plaintiff and the Court within 45 days. (*See* Order, dated Oct. 30, 2007, at 2.) Plaintiff was ordered to file an amended complaint identifying Defendants by their proper names no later than 30 days after receiving the names, and to serve the amended complaint via the Court's Pro Se Office. (*See id.*) Plaintiff was cautioned that *"[f]ailure to comply with this deadline may result in the dismissal of the plaintiff's complaint."* (*Id.* at 3.)

By letter dated December 17, 2007, the USAO identified Defendant Figueroa as John Doe No. 1, and Defendant Ventiere as John Doe No. 3, based on the allegations in the Complaint. (*See* Defs.' Ltr., dated Dec. 17, 2007.) The USAO was unable to identify the remaining John Does. The USAO noted that the Complaint contained no allegations against John Does Nos. 9-11. Finally, the USAO wrote that "no less than forty different officers and/or independent contractors hired by the USMS may have come into contact with Plaintiff while he was being transported from prison to Court, and to the Courthouse cellblock while attending Court conferences, hearings, or his trial," and without more specific information, the USMS was unable to determine which of those officers might have been the John Does described in the Complaint. (*Id.*)

On January 6, 2008, Plaintiff requested that the Court order the USAO to produce the names and pictures of all forty of the officers and independent contractors. (*See* Pl.'s Ltr., dated Jan. 6, 2008.) On January 17, 2008, Judge Sullivan denied this request as premature, ordered Plaintiff to submit additional details about the remaining John Doe Defendants by February 17, 2008, and ordered the USAO to make reasonable efforts to identify the remaining Defendants within 45 days of receiving the new details

from Plaintiff. (*See* Order, dated Jan. 17, 2008.) Plaintiff was also ordered to either amend the Complaint within 30 days of receiving the names of the John Doe Defendants, or renew his request for photographs of all forty individuals, should identification by the USAO prove unsuccessful. (*See id.*)

By letter dated February 17, 2008, Plaintiff provided physical descriptions of four of the remaining John Doe Defendants, and an additional factual allegation against a fifth John Doe Defendant.[FN2] (*See* Pl.'s Ltr., dated Feb. 17, 2008.) After 45 days passed and the USAO did not submit a response, Plaintiff wrote to the Court to request a status update. By letter dated June 30, 2008, the USAO indicated that it never received Plaintiff's February 17, 2008 letter. [FN3] (*See* Defs.' Ltr., dated June 30, 2008.) By Order dated July 3, 2008, Judge Sullivan ordered the USAO to respond to Plaintiff's letter within 20 days, and ordered Plaintiff to file an amended complaint within 30 days of receipt, or renew his request for the photographs. (*See* Order, dated July 3, 2008.)

> **FN2.** After the USAO identified John Does Nos. 1 and 3, six John Does remained unidentified, not including John Does Nos. 9-11.

> **FN3.** Plaintiff's February 17, 2008 letter indicated that the USAO was copied on the letter. (*See* Pl.'s Ltr., dated Feb. 17, 2008.)

**\*6** On August 15, 2008, the USAO informed the Court that they had been unable to conclusively identify any more of the unnamed Defendants based on the information that Plaintiff provided.[FN4] (*See* Defs.' Ltr., dated Aug. 15, 2008.) The USAO indicated that they believed that one of the John Doe Defendants was "most likely" A.J. Krause, but Plaintiff's descriptions were simply too vague to further identify the unnamed Defendants with reasonable certainty. (*See id.*)

> **FN4.** The Court granted the USAO additional time, beyond the 20 days originally provided, to submit its response.

On September 17, 2008, Plaintiff renewed his request for the names and photographs of all 40 officers, claiming

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

that he needed the information in order to set forth his claims of a "civil conspiracy." [FN5] (*See* Pl.'s Ltr., dated Sept. 17, 2008.) Judge Sullivan denied Plaintiff's request, finding that Plaintiff's "conclusory allegations" did not warrant such an order. (*See* Order, dated Sept. 30, 2008.) Instead, Plaintiff was granted leave to amend the Complaint to add parties as appropriate, and to include any new information that had been developed after the action was commenced. (*See id.*) Judge Sullivan instructed Plaintiff to "add as much identifying detail as possible in order to satisfy the requirements of a valid pleading," and informed him that, to the extent that the amended pleading stated claims against employees of the USMS, he could use the pre-trial discovery process and possibly Court assistance to identify the remaining unnamed Defendants. (*See id.*) Finally, Judge Sullivan reminded Plaintiff of the three-year statute of limitations that governed his claims, and warned him that "[A]n amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." (*See id.* (quoting *Barrow v. Wethersfield, 66 F.3d 466, 470 (2d Cir.1995)*).)

> FN5. Neither Plaintiff's Complaint nor his Amended Complaint alleges claims for civil conspiracy.

Plaintiff filed the Amended Complaint on January 2, 2009. He named as Defendants the United States of America, the USMS, Luis Figueroa (formerly John Doe No. 1), Donny LaRosa (whom Plaintiff refers to as "Donny LNU," and was formerly John Doe No. 2),[FN6] Thomas Ventiere (formerly John Doe No. 3), and A.J. Krause (formerly John Doe No. 5). Plaintiff also maintained his action against John Does Nos. 4, 6, 7, and 8, although John Doe No. 8 is not included in the caption of the Amended Complaint. Plaintiff sued the Individual Defendants in their official as well as individual capacities.

> FN6. Plaintiff identified John Doe No. 2 as "Donny LNU," (presumably, "last name unknown"), without assistance from Defendants. Defendants have identified this individual as Donny LaRosa.

Judge Sullivan ordered Plaintiff to serve the Amended Complaint by April 1, 2009. (*See* Order, dated Mar. 2, 2009.) Due to a change of address, Plaintiff did not receive this Order, and, on April 9, 2009, Plaintiff requested an extension of time to serve Defendants. Judge Sullivan granted Plaintiff's request, and ordered Plaintiff to serve the Amended Complaint by May 15, 2009, and to submit a status letter to the Court by May 29, 2009, describing his efforts to serve Defendants. (*See* Order, dated Apr. 14, 2009.)

**\*7** Having received no updates or certificates of service from Plaintiff by June 5, 2009, Judge Sullivan ordered the action dismissed pursuant to Federal Rule of Civil Procedure 41(b). (*See* Order, dated June 5, 2009.)

On June 17, 2009, Plaintiff requested reconsideration of the Order of Dismissal, on the grounds that he had served Defendants, but had been awaiting the process receipts, which he did not receive until June 10, 2009. (*See* Pl.'s Ltr., dated June 17, 2009.) Plaintiff claimed that he had been under the impression that if he served Defendants, he did not need to submit a status letter by May 29, 2009. The Court reopened the case on June 23, 2009. (*See* Order, dated June 23, 2009.) Plaintiff thereafter submitted the process receipts, which indicated that Plaintiff mailed service packages to the USMS on May 12, 2009; the forms were acknowledged as received on May 27, 2009; and process was effectuated on June 2 and 4, 2009.

### DISCUSSION

Defendants contend that (1) the claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity, and should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; (2) the claims against the Individual Defendants in their personal capacities are time-barred and/or fail to state claims upon which relief can be granted, and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (3) Plaintiff failed to effectuate service on the Individual Defendants within 120 days of the filing of the Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

Complaint, and those claims should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. (See Defs.' Memorandum of Law, dated Aug. 21, 2009 ("Defs.' Mem."), at 8-19.)

In response, Plaintiff primarily addresses Defendants' argument that the Amended Complaint fails to state a claim upon which relief can be granted, based on Plaintiff's alleged failure to comply with the applicable statute of limitations. Plaintiff argues that the initial Complaint was timely filed, and the Amended Complaint "relates back" to the date of the original filing. (See Pl.'s Memorandum of Law, dated Aug. 31, 2009 ("Pl.'s Mem."), at 1-3.) Plaintiff does not address Defendants' arguments regarding sovereign immunity and insufficiency of service of process.

**I. Subject Matter Jurisdiction Under Rule 12(b)(1)**

A. *Legal Standard*

On a Rule 12(b)(1) motion, "the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Dong v. Ridge,* No. 02 Civ. 7178(HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005) (quoting *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004)); *see also Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Marshall v. Nat'l Ass'n of Letter Carriers,* Nos. 00 Civ. 3167(LTS), 01 Civ. 3086(LTS), 2003 WL 223563, at *6 (S.D.N.Y. Feb. 3, 2003).

**\*8** It is "axiomatic" that, under the principle of sovereign immunity, "the United States may not be sued without its consent, and the existence of consent is a prerequisite for jurisdiction." *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2003). "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941) (citations omitted); *see also Lehman v. Nakshian,* 453 U.S. 156, 160-61, 101 S.Ct. 2698, 2701-02 (1981); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953-54 (1976); *Dotson v. Griesa,* 398 F.3d 156, 177 (2d Cir.2005) ("a finding of sovereign immunity ... deprive[s][a] court of subject matter jurisdiction"). In other words, the United States must unequivocally express

its consent to be sued by specifically waiving sovereign immunity in a statutory text. *See Lane v. Peña,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096 (1996); *see also United States v. Nordic Village, Inc.,* 503 U.S. 30, 33-44, 112 S.Ct. 1011, 1014-15 (1992); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980). Further, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman,* 453 U.S. at 161, 101 S.Ct. at 2702 (quoting *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273 (1957) (quotation marks omitted)); *see also Lane,* 518 U.S. at 192, 116 S.Ct. at 2096 ("a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

The United States need not be an expressly named defendant for an action to be considered as one against the sovereign. "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act ." *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 723 (2d Cir.1983) (internal quotation marks and citations omitted) (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, (1963); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012 (1947); and *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468 (1949)). It follows that a suit against a federal agency or its officers, acting in their official capacities, constitutes a lawsuit against the federal government. *See Dotson,* 398 F.3d at 177 (federal agencies and officers acting in official capacities protected by sovereign immunity); *see also FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit"); *Kemer v. Johnson,* 900 F.Supp. 677, 681 (S.D.N.Y.1995) (citing *B.K. Instrument,* 715 F.2d at 723) (federal officers acting in official capacities protected by sovereign immunity)).

B. *Application*

**\*9** In the instant case, Plaintiff has named the United States and the USMS as Defendants, and asserted claims against the Individual Defendants in their official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

capacities, as well as their personal capacities. Because the USMS is a federal agency, and the Individual Defendants, in their official capacities, are officers of that agency, claims asserted against them are in fact asserted against the United States. Thus, absent an "unequivocally expressed" statutory waiver of sovereign immunity for claims of this type, these claims will be barred by sovereign immunity. *See Lane,* 518 U.S. at 192, 116 S.Ct. at 2096.

Here, as Plaintiff alleges that Defendants used excessive force and harassed him, in violation of the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution, he is asserting constitutional tort, and there is no waiver of sovereign immunity. *See Castro v. United States,* 34 F.3d 106, 110 (2d Cir.1994) ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts."); *see also Robinson v. Overseas Military Serv. Corp.,* 21 F.3d 502, 510 (2d Cir.1994); *Doe v. Torres,* No. 05 Civ. 3388(JSR)(GWG), 2006 WL 290480, at *4 (S.D.N.Y. Feb. 8, 2006); *James v. United States,* No. 99 Civ. 4238(BSJ)(HBP), 2003 WL 22149524 at *4 (S.D.N.Y. Sept. 17, 2003). Because sovereign immunity has not been waived, the Court lacks subject matter jurisdiction over Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities. Accordingly, those claims must be dismissed.

Defendants also contend that, to the extent that the Amended Complaint is construed to assert common law tort claims, they are also barred for lack of subject matter jurisdiction. (*See* Defs'. Mem. at 10-11.) As an initial matter, the United States is the only proper Defendant in a claim brought under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2679(b)(1). And, although the United States has waived sovereign immunity for a limited subset of tort claims via the FTCA, *See id.* § 1346(b), Plaintiff must first exhaust all administrative remedies prior to commencing a federal action. *See id.* § 2675(a). This requirement is jurisdictional, and cannot be waived. *Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.1983). Plaintiff does not dispute that he has not presented his claims to the USMS, and so they remain unexhausted. (*See* Declaration of Gerald M. Auerbach, USMS General Counsel, dated Aug. 20, 2009.)

Accordingly, any common law tort claims must also be dismissed for lack of subject matter jurisdiction.

## II. Failure to State a Claim Under Rule 12(b)(6)

Defendants contend that Plaintiff's claims against the identified Individual Defendants in their individual capacities should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[FN7] (*See* Defs.' Mem. at 11-17.) Defendants' argument is two-fold. First, Defendants argue that Plaintiff's claims arising out of conduct more than three years prior to the filing of the Amended Complaint, where Plaintiff first identified some of the Individual Defendants, are time-barred. (*See id.* at 12-14.) Second, Defendants assert that any remaining claims do not rise to the level of a constitutional violation. (*See id.* at 14-17.)

> FN7. Defendants do not address the claims against the remaining John Doe Defendants. Because those Defendants have not been named, and thus have not been served, this Court lacks personal jurisdiction over them. Accordingly, those claims should also be dismissed. *See Williams v. Winfield,* No. 94 Civ. 6384(TPG), 2002 WL 91619, at *2 (S.D.N.Y. Jan. 24, 2002) (dismissing claims against unidentified correctional officer for lack of personal jurisdiction, after counsel for defendants could not identify him despite good faith efforts to do so).

*10 In response, Plaintiff contends that the claims of the Amended Complaint "relate back" to the date of the original Complaint, February 28, 2007, and are therefore timely.[FN8] (*See* Pl.'s Mem. at 3.) This would include any claims arising out of conduct occurring on or after February 28, 2004.

> FN8. Plaintiff also argues that 28 U.S.C. § 2401(a) provides for a six-year statute of limitations for *Bivens* claims. (*See* Pl.'s Mem. at 3-4.) The Second Circuit Court of Appeals has made clear that *Bivens* claims are governed by a three-year statute of limitations. *See Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

After the parties fully briefed the motion to dismiss, the Court requested additional submissions on two questions: (1) which, if any, of Plaintiff's *Bivens* claims would be timely pursuant to Federal Rule of Civil Procedure 15(c)(1)(A), which permits the Court to look to New York State's more forgiving body of statute of limitations law?; and (2) to the extent Plaintiff's claims "relate back" under this framework, do the surviving claims rise to the level of constitutional violations? (*See* Order, dated Dec. 29, 2009.) The Court also requested Plaintiff to provide details regarding his efforts to determine the identities of the John Doe Defendants, both before and after filing the Complaint. (*See id.*)

In response to the Court's inquiry, Defendants contend that Rule 15(c)(1)(A) is wholly inapplicable to *Bivens* claims, but even if it were to apply, Plaintiff's surviving claims do not rise to the level of constitutional violations. (*See* Defendants' Supplemental Memorandum of Law, dated Jan. 15, 2010 ("Defs.' Supp. Mem.").)

Plaintiff, on the other hand, responded to the Court's request by merely stating that he acted diligently and to the best of his abilities at all times given his *pro se* status and limited resources as a prisoner. (*See* Plaintiff's Supplemental Memorandum of Law, dated Jan. 26, 2010 ("Pl.'s Supp. Mem."), at 2.) Plaintiff further contends that New York law permits tolling of the statute of limitations when a plaintiff is unable to identify a defendant, provided he acts diligently in his attempts to do so. (*See id.* at 2-3 (citing *Mabry v. N.Y.C. Dep't of Corr.*, No. 05 Civ. 8133(JSR) (JCF), 2008 WL 6190003 (S.D.N.Y. Mar. 7, 2008)).)

A. *Statute of Limitations*

1. *Legal Standard*

"A *Bivens* action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights." *See Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir.2007); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994). Federal courts sitting in New York apply a three-year statute of limitations period to *Bivens* claims. *See*

*Kronisch*, 150 F.3d at 123; *see also Tapia-Ortiz v. Doe*, 171 F.3d 150, 151 (2d Cir.1999). Therefore, a plaintiff filing a constitutional claim against federal officers in their individual capacities must institute his suit no more than three years after the cause of action first accrued. If it is determined that the relevant date for statute of limitations purposes in this case is the date of Plaintiff's original Complaint, the majority of his claims are timely (i.e., those accruing on or after February 28, 2004). On the other hand, if the date of the Amended Complaint (January 2, 2009) is the relevant date, Plaintiff is left with only those claims accruing on or after January 2, 2006.

**\*11** The Second Circuit has stated that "[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party [in an amended pleading] in effect constitutes a change in the party sued." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.1993). Therefore, "[s]uch an amendment may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met." *Id.; see also Barrow v. Wethersfield*, 66 F.3d 466, 468 (2d Cir.1995). If the requirements of Rule 15(c) are met, an amended pleading will be said to "relate back" to the date of the original complaint. *See* Fed.R.Civ.P. 15(c).

Pursuant to Rule 15(c), an amended pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

... or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if [the amendment arose out of the same conduct in the original pleading] and if ... the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

concerning the proper party's identity.

Fed.R.Civ.P. 15(c)(1). Because "state law supplies the statute of limitations period" for a *Bivens* claim, *see Kronisch,* 150 F.3d at 122, the Court has the option of applying state law to determine if the amended pleading relates back.

In deciding whether to apply state or federal relation back law, the Court must determine which law "affords a more forgiving principle of relating back." *See Wilson v. The City of N.Y.,* No. 03 Civ. 2495(RLC), 2006 WL 2528468, at *2 (S.D.N.Y. Aug. 31, 2006) (citation omitted). In comparing the two, the Advisory Committee's Notes to Rule 15(c) direct the Court to look at " 'controlling bod[ies] of limitations law,' which in this case includes all the tolling provisions in the New York Civil Practice Law and Rules ("CPLR") and the interpretations of these statutes found in New York case law." *Id.* (citing Fed.R.Civ.P. 15(c) (1) Advisory Committee's Note (1991); *see also Mabry,* 2008 WL 619003, at *6; *Murphy v. West,* 533 F.Supp.2d 312, 316 (W.D.N.Y.2008); *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *6 (S.D.N.Y. Aug. 31, 2007) (all applying New York limitations law to claims brought against "John Doe" defendants in federal court).[FN9]

> FN9. Defendants' contention that Rule 15(c)(1)(A) is inapplicable to *Bivens* claims is without merit. While such claims are purely federal in nature, the three-year statute of limitations that governs *Bivens* claims is derived from state law. *See Kronisch,* 150 F.3d at 122 (noting that "state law supplies the statute of limitations period" for *Bivens* claims).

Turning first to the federal relation-back rule (Fed.R.Civ.P. 15(c)(1)(C)), it is well-established in this Circuit that "an amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow,* 66 F.3d at 470; *see also Tapia-Ortiz,* 171 F.3d at 152. This is because "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Barrow,* 66 F.3d at 470.

**\*12** New York law, however, is more forgiving in the case of "John Doe" defendants. *See Laureano,* 2007 WL 2826649, at *6. The controlling body of New York limitations law "creates a special procedure for John Doe cases that focuses on notice to possible defendants rather than whether the failure to name the defendant was an excusable mistake." *Wilson,* 2006 WL 2528468, at *3; *see also* N.Y. CPLR 1024.

CPLR 1024 permits a plaintiff to file an action against an unknown defendant, provided that several conditions are met. *See Bumpus v. N.Y.C. Transit Auth.,* 66 A.D.3d 26, 29-30, 883 N.Y.S.2d 99, 103-04 (2d Dep't 2009). First, a plaintiff must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* The failure to act diligently to ascertain the unidentified defendant's name "subjects the complaint to dismissal as to that party." *Id.* If a plaintiff is unable to identify the defendant, he may commence the action against a "John Doe" defendant "describ[ing] [the unknown party] in such form as will fairly apprise the party that she is the intended defendant." [FN10] *Id.* (citation omitted). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and ... serve process upon them, within 120 days from filing." *Id.* at 31, 883 N.Y.S.2d at 105. The 120-day deadline imposed by CPLR 305-b may be extended "upon good cause shown or in the interest of justice." [FN11] N.Y. CPLR 305-b.

> FN10. In New York state cases applying CPLR 1024, plaintiffs commencing actions against unidentified defendants are typically required to "present an affidavit stating that a diligent inquiry has been made to determine the names of such parties." *Luckern v. Lyonsdale Energy Ltd. P'ship,* 229 A.D.2d 249, 253, 654 N.Y.S.2d 543, 546 (4th Dep't 1997) (citation omitted).

> FN11. Rule 4(m) of the Federal Rules provides a similar 120-day requirement with extensions granted upon a showing of "good cause." *See* Fed.R.Civ.P. 4(m).

To identify unknown parties after filing, a plaintiff is

Case 9:10-cv-00026-FJS-DEP   Document 39   Filed 08/03/11   Page 112 of 123

Page 10

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

advised to serve discovery demands upon any known parties, seek disclosures pursuant to a Freedom of Information Law ("FOIL") request, or otherwise act with diligence. *Bumpus,* 66 A.D.3d at 33-34, 883 N .Y.S.2d at 107. If the unknown parties are identified prior to the deadline for service of process, the statute provides for amendment of the pleadings *nunc pro tunc. See Florence v. Krasucki,* 533 F.Supp. 1047, 1053 n. 3 (W.D.N.Y.1982) (citing N.Y. CP LR 1024). In essence, an amended pleading identifying previously unknown parties does not "relate back" to the date of the original pleading under New York's "unity of interest" test, *see, e.g., Monaardi v. BJ's Wholesale Club,* 45 A.D.3d 1149, 1150-51, 846 N.Y.S.2d 441, 442 (3d Dep't 2007), but rather, the statute of limitations is actually tolled from the date of the original filing until service. *See Wilson,* 2006 WL 2528468, at *3; *see also Luckern,* 229 A.D.2d at 255, 654 N.Y.S.2d at 546 (Under CPLR 1024, "an action commenced against unknown parties is deemed interposed, for Statute of Limitations purposes, when the 'John Doe' summons with notice is filed with the clerk of the court.").

2. *Application*

Here, it is clear that Plaintiff's failure to identify any of the Individual Defendants prior to the running of the three-year statute of limitations is fatal to his *Bivens* claims under the federal relation-back rule, because it was not the result of mistake. *See* Fed.R.Civ.P. 15(c)(1)(C); *see also Tapia-Ortiz,* 171 F.3d at 152; *Barrow,* 66 F.3d at 470. The Court must therefore decide whether Plaintiff may avail himself of New York's more forgiving statute of limitations rules. To succeed in this respect, the Court must conclude that (1) Plaintiff has acted with due diligence in identifying the Individual Defendants both before and after filing his original Complaint; (2) Plaintiff provided sufficient detail in the original Complaint such that the Individual Defendants would be on notice of the claims had they read the pleading; and (3) Plaintiff served the Amended Complaint on the Individual Defendants within 120 days of filing the Complaint.

**\*13** Plaintiff has provided no information regarding his pre-filing efforts to identify the Individual Defendants. Despite this Court's request that Plaintiff provide additional details in this regard, Plaintiff merely wrote that

he has "made his best effort to carry out the case accordingly." (*See* Pl.'s Supp. Mem. at 2.) While the Court recognizes Plaintiff's limitations, given his incarceration and *pro se* status, Plaintiff must show that he exercised some due diligence in an attempt to identify the Individual Defendants prior to filing the Complaint. The incidents in the Complaint are alleged to have occurred as early as February 2004. Yet, Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed. Between February 2004 and February 2007, Plaintiff could have filed FOIL requests or written letters to the USAO or even his criminal defense attorney. *See Laureano,* 2007 WL 2826649, at *6 (plaintiff sent letters, discovery requests, and searched public records to identify defendants); *Wilson,* 2006 WL 2528468, at *3 (plaintiff served "several unanswered discovery requests" and FOIL requests in order to identify defendants). Even if unsuccessful, this would have at least evinced some degree of diligence. And, Plaintiff certainly could have filed the original Complaint much sooner than he did-which happened to be the day before the statute of limitations was to run on his most serious claim regarding the physical assault of March 1, 2004. Had he done so, he could have then sought Court assistance with identifying the Individual Defendants.

Having failed to offer any evidence of diligence prior to filing the Complaint, on this basis alone, Plaintiff does not meet the requirements of CPLR 1024, and the Amended Complaint should be dismissed as time-barred. *See. e.g., Hall v. Rao,* 26 A.D.3d 694, 695, 809 N.Y.S.2d 661, 662 (3d Dep't 2006) (dismissing complaint, purportedly filed under CPLR 1024, when "record is utterly devoid of proof documenting what efforts, if any, plaintiffs undertook to identify [defendant] prior to the expiration of the statute of limitations").

The absence of effort by Plaintiff to identify Defendants prefiling, continued after the Complaint was filed. Upon filing the Complaint in February 2007, Plaintiff made no effort to ascertain the Individual Defendants' names until more than six months later, in September 2007. The Court's Pro Se Office sent Plaintiff the initial summons and service package on April 25, 2007, yet, the case otherwise remained dormant through August, when Plaintiff first mailed the service package to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the USMS. At that point, however, it was clear that there could be no service, since Plaintiff provided no information as to whom to serve.

It was not until September 5, 2007, after service was unable to be effectuated, that Plaintiff first wrote to the Court to request assistance in identifying the Individual Defendants, and to seek an extension of time to serve them (despite their John Doe status at that time). But by then, the statute of limitations had already run on most of the incidents alleged in the Complaint. Further, more than 120 days had elapsed since the Complaint had been filed and Plaintiff had received the service package. This too was fatal to tolling the statute of limitations under New York law, since, as discussed, a John Doe complaint must be served within 120 days of filing, unless the court has extended that period prior to its expiration.

**\*14** Nevertheless, the Court breathed life into Plaintiff's claims when it requested that the USAO attempt to identify the Individual Defendants. In December 2007, the USAO identified two of the Individual Defendants, but the vague descriptions in the Complaint prevented identification of the remaining nine John Does. Rather than amend the Complaint at this time to identify and serve the two known Defendants, in February 2008, Plaintiff provided further descriptions of five John Does. However, these were again, too vague, and resulted only in the identification of Defendant Krause, in August 2008.

Failing again to amend the Complaint, Plaintiff renewed his request for the names and photographs of every employee of the USMS that he came into contact with on the dates within the Complaint. This was denied on several occasions. (*See* Order, dated Jan. 17, 2008; Order, dated July 3, 2008; Order, dated Sept. 30, 2008.) In one Order, Judge Sullivan forewarned Plaintiff of the statute of limitations problems inherent in Plaintiff's continued delay in filing the Amended Complaint. (*See* Order, dated Sept. 30, 2008.) Three months later, nearly two years after the statute of limitations had expired, and approximately five years after most of the alleged incidents occurred, Plaintiff filed the Amended Complaint, on January 2, 2009, identifying four of the Individual Defendants. On June 2 and 4, 2009, the Amended Complaint was served on the identified Defendants. While

Plaintiff's post-filing efforts were certainly better than those prior to February 2007, more is required under CPLR 1024.

In light of the absence of any pre-filing efforts to identify the Individual Defendants, Plaintiff's failure to identify or serve any Defendants within 120 days of filing the Complaint, the deficiencies in Plaintiff's post-filing efforts to ascertain the Individual Defendants' identities, and Plaintiff's delay in filing and serving the Amended Complaint, Plaintiff may not avail himself of New York's more forgiving law regarding the statute of limitations and John Doe defendants. In those federal cases that have invoked CPLR 1024, the plaintiffs have exercised a degree of diligence not shown by Plaintiff in the instant case. *See, e.g.,* *Mabry,* 2008 WL 619003, at \*6 (plaintiff "aggressively sought the identities of defendants" through letters and discovery requests); *Murphy,* 533 F.Supp.2d at 316 (plaintiff sought identities of John Does from identified defendants prior to the expiration of the statute of limitations); *Laureano,* 2007 WL 2826649, at \*6 (plaintiff's counsel submitted an affidavit detailing efforts undertaken to identify defendants, which included letters, discovery requests, and a search of public records); *Wilson,* 2006 WL 2528468, at \*3 (plaintiff served "several unanswered discovery requests" and FOIL requests). Accordingly, Plaintiff's claims arising out of conduct occurring more than three years prior to January 2, 2009, the date on which some of the Individual Defendants were first identified in the Amended Complaint, are time-barred.

B. *Plaintiff's Remaining Timely Claims*

**\*15** In the Amended Complaint, Plaintiff asserts a single timely claim against one Defendant. Plaintiff claims that, on May 5, 2006, as he was being escorted to a holding cell after a post-trial hearing, Defendant Ventiere "popped from out of a door of a room with a large one-way mirror and said 'I heard that and I'll teach you a lesson.' " (*See* Am. Compl. ¶ 53.) According to Plaintiff, he had been explaining his problems with the Individual Defend ants to another U.S. Marshal when this occurred. (*See id.*) Afterwards, Plaintiff alleges that he sat in a holding cell "in utter fear, not knowing if something would happen." (*See id.*) There is no allegation that anything did

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

happen.

Liberally construing Plaintiff's *pro se* Complaint, the Court views Plaintiff's claim as one of retaliation under the First Amendment. In the alternative, Plaintiff appears to allege that the verbal threat, in and of itself, constituted a constitutional violation.

1. *Legal Standard on a Motion to Dismiss Under Rule 12(b) (6)*

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1964-65 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *see id.* at 570, 127 S.Ct. at 1974, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *See id.* at 555, 127 S.Ct. at 1965 (citation omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570, 127 S.Ct. 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *See id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974.

2. *First Amendment Claim*

To state a retaliation claim under the First

Amendment, the Plaintiff must allege that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the plaintiff's speech and the adverse action. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). In the prison context, the Second Circuit has defined an "adverse action" as conduct "that would deter similarly situated individuals of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Specifically, the Court of Appeals has found that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992 (2002).* In determining whether a verbal threat constitutes an adverse action, a court must consider the statement's specificity and the context in which it was given. *See Mateo v. Fischer,* No. 08 Civ. 7779(RJH)(DCF), 2010 WL 431229, at *8 (S.D.N.Y. Feb. 8, 2010).

**\*16** Here, the adverse action alleged by Plaintiff is facially insufficient to state a claim for relief. Defendant Ventiere's statement is more akin to a general threat, made in response to Plaintiff's casual conversation with another U.S. Marshal regarding his purported mistreatment.[FN12] *See Dawes,* 239 F.3d at 493 (calling plaintiff-prisoner a "rat" or "informant" insufficient to state a First Amendment claim); *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (dismissing plaintiff's First Amendment claim based on prison official's threat that "we [are] going to get you, you better drop the suit"); *Alicia v. Holwell.* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's statements that there were "no secrets in prison," and that plaintiff would "have to pay the consequences" for filing a grievance do not state a retaliation claim); *Cruz v. Hillman,* No. 01 Civ. 4169(DAB)(DCF), 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (Report and Recommendation) (dismissing retaliation claim based on defendant's purported "dislike" for inmates who file civil lawsuits, followed by a statement to plaintiff that "Green Haven is an open battlefield, so be careful"); *cf. Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("if you don't

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

stop writing grievances I'm going to break your fuckin' neck" was direct and specific enough to state retaliation claim). Accordingly, Plaintiff's First Amendment retaliation claim, arising out of Defendant Ventiere's conduct on May 5, 2006, should be dismissed.

> FN12. It is questionable whether Plaintiff's conversation with the U .S Marshal would constitute "protected speech." Plaintiff had not yet filed the instant suit, nor had he filed any grievances at the time. Nor was he making a request for assistance to a supervisory official.

3. *Other Constitutional Claims*

To the extent that Plaintiff claims that Defendant Ventiere's statements, standing alone, give rise to a constitutional violation, the Court recommends dismissal pursuant to Rule 12(b)(6).

It is well-established law that, without more, verbal threats and intimidation do not rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name calling insufficient to allege a constitutional violation); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006) ("verbal intimidation does not rise to the level of a constitutional violation"); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"); *see also Petty v. Goord,* No. 00 Civ. 803(JSR), 2008 WL 2604809, at *5 (S.D.N.Y. June 25, 2008) (verbal harassment related to inmate's HIV-positive status did not state a claim under the Eighth Amendment); *Davidson v. Tesla,* No. 06 Civ. 861, 2008 WL 410584, at *4 (D.Conn. Feb. 13, 2008) (no constitutional violation based on officer acting in an "angry, hostile, aggressive and belligerent manner").

Here, Plaintiff merely alleges that Defendant Ventiere threatened to "teach [him] a lesson." (Am.Compl.¶ 53.) This general threat, detached from the other untimely alleged incidents by more than two years, and not followed by any physical acts, is insufficient to state a constitutional violation. Accordingly, Plaintiff's claim based on Defendant Ventiere's verbal threat on May 5, 2006, should be dismissed.[FN13]

> FN13. Because this Court recommends dismissal of all of Plaintiff's claims pursuant to Rules 12(b)(1) and (6), discussion of Defendants' third and final ground for dismissal-insufficient service of process-is unnecessary.

## CONCLUSION

**\*17** For the above reasons, I respectfully recommend that Defendants' motion to dismiss be granted, and all claims against Defendants be dismissed. Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity. Plaintiff's claims against the Individual Defendants in their individual capacities are time-barred and/or fail to state a claim upon which relief can be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See* *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

S.D.N.Y.,2010.

Williams v. U.S.
Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

March 16, 2010.
*ORDER ADOPTING REPORT AND
RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** On February 28, 2007, Plaintiff Larry Williams, who is incarcerated and proceeding *pro se,* initiated this suit by delivering a complaint to prison officials for them to file on his behalf. The complaint was received by the court's Pro Se Office on March 9, 2007 and docketed on April 14, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Kenneth M. Karas, District Judge, and reassigned to the docket of the undersigned on September 4, 2007. (Doc. No. 3.)

The only Defendants named in the complaint were "John Does 1-11, sued in their individual capacities," whom Plaintiff described as United States Marshals. Accordingly, on October 30, 2007, the Court ordered the United States Attorney's Office for the Southern District of New York ("the USAO") to identify the officers described in the complaint. After an extended investigation period, four Marshals were eventually identified by name: Luis Figueroa, Donny LaRosa, Thomas Ventiere, and A.J. Krause. Plaintiff then filed an amended complaint on January 2, 2009-more than twenty-two months after the original complaint was filed-adding the named defendants, in their individual and official capacities, and other parties. (Doc. No. 19.) The Court ordered Plaintiff to serve the amended complaint by April 1, 2009 (Doc. No. 20), which was later extended until May 15, 2009 at Plaintiff's request (Doc. No. 22). Plaintiff mailed service packages to the Marshals Service on May 12, 2009, and process was effectuated on June 2 and 4, 2009. On August 21, 2009, Defendants moved to dismiss the amended complaint. The motion was fully submitted on September 22, 2009, and was subsequently referred to the Honorable Theodore H. Katz, Magistrate Judge, for a Report and Recommendation.

On February 25, 2010, Judge Katz issued a Report recommending that Defendants' motion be granted in its entirety. Specifically, Judge Katz recommended (1) dismissing claims against the remaining John Doe defendants for lack of personal jurisdiction; (2) dismissing claims against the United States, the United States Marshals Service, and the individual defendants in their official capacities as barred by the doctrine of sovereign immunity; (3) dismissing as time-barred all claims against the individual defendants that are based on events that took place before January 2, 2006; and (4) dismissing the remaining timely claims for failure to state a claim on which relief can be granted. In the Report, Judge Katz advised the parties that failure to file timely objections within fourteen days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b) (1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Katz's well-reasoned and persuasive Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted. The clerk of the court is respectfully directed to terminate the motion found at Doc. No. 35 and to close this case.

**\*2** SO ORDERED.

S.D.N.Y.,2010.

Williams v. U.S.
Slip Copy, 2010 WL 963465 (S.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated

December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.